# STATE OF NORTH DAKOTA v. FRANCIS BRUNETTE.

## (150 N. W. 271.)

**Bastardy proceedings — quasi-criminal — trial governed by rules of civil actions.**

1. A bastardy proceeding which is brought under the provisions of chapter 5, Rev. Codes 1905, although quasi-criminal in its nature, is governed, in so far as its trial is concerned, by the law regulating civil actions.

**Defendant — reputation — chastity — evidence of — not admissible.**

2. In a bastardy proceeding which is brought under the provisions of chapter 5, Rev. Codes 1905, evidence as to the reputation of the defendant for chastity is not admissible.

**Bastardy proceeding — evidence of promise of marriage — before intercourse — competent to show relationship — and is corroborative.**

3. It is not error in a bastardy proceeding to permit the complaining witness to testify that the defendant, before the acts of intercourse complained of, led her to believe that they were to be married, as such evidence tends to show the relationship of the parties, and is corroborative in its nature.

**Complaining witness — presents — given her by other men — not competent — too general — not confined to times in issue.**

4. It is not error to refuse to permit the complaining witness to testify as to presents given her by other men, when the questions asked are general and are not confined to the times in issue.

**Remarks of defendant's counsel — addressing jury — upon matters not in evidence — witness — character of, not in issue or questioned — improper — caution by court — not error.**

5. Where counsel for defendant in his closing argument makes a statement: "This is M—, I could say more, I couldn't say less. He is an absolutely unreliable man, and an absolutely unreliable police magistrate,"—and there is no evidence in the record which tends in any way to question the general reliability of the witness, nor any which casts discredit upon his career as a police magistrate, and it is not error for the court to say: "I think you will have to be a little careful, Mr. H—, in the use of your words. You have a certain latitude, but beyond that, please don't go; . . . getting so close to the line it was dangerous."

**Complaining witness — period of gestation — acts of, outside of such period.**

6. It is not error in a bastardy proceeding to refuse to allow the complainant to testify on cross-examination as to whether she had, outside of the period of gestation, asked the defendant to go with her to a house of prostitution.

**Complaining witness — testimony of — corroboration not necessary to convict.**

7, It is not necessary to a conviction under chapter 5 of the Criminal Code of North Dakota (Rev. Codes 1905) that the testimony of the complainant should be corroborated by other evidence.

**Charge of court — errors must be pointed out — taking advantage of.**

8. Where counsel wishes to take advantage of alleged errors in the court's charge, he should point out the portion of the charge which is subject to criticism and wherein the defects, if any, consist.

**Judgment in — maintenance of child — court may vacate or modify judgment — notice of — necessity for same — court must acquaint himself with the facts.**

9. Sec. 9655, Rev. Codes 1905, which provides that in a bastardy proceeding and in cases of a verdict of guilty, the court "shall render such judgment as may seem necessary to secure, with the assistance of the mother, the maintenance and education of such child until such time as the child is likely to be able to support itself. . . . The court may at any time, upon the motion of either party, upon ten days' notice to the other party, vacate or modify such judgment as justice may require,"—presupposes that the court shall reasonably acquaint himself with the necessities of the case. It nowhere, however, provides for the method or how the information shall be obtained. The taking of testimony, therefore, upon such questions and before the rendition of judgment, is not necessary where the station in life, age, and occupations of all of the parties interested have been fully exposed upon the trial, and especially where the defendant takes no exception to the methods pursued by the trial court until after the rendition of the judgment.

Additional Syllabus on Rehearing.

**Medical books — contents of — introducing in evidence — reading from, to jury — contradicting expert witness — must be relied upon, by witness — must have based testimony on same — attention must be called to same.**

10. Before the contents of medical books may be introduced in evidence and read to the jury for the purpose of refuting the testimony of a medical expert, it is necessary that the attention of the witness shall be first called to such books, and that he shall have based his opinion upon the same; and it would be a mere evasion of the rule to allow counsel in the cross-examination of a witness who has not either based his opinion upon the specific book, nor upon the authorities generally, nor whose opinion in the nature of things must necessarily be based upon authorities, to read to such witness portions of a medical work, and to ask him if he concurs in or differs from the opinions therein expressed. Such a proceeding would be nothing more nor less than impeaching the witness by a text-book on which he has in no way relied, and

where no foundation for his impeachment has been laid, and by an authority who is not present in court and cannot be cross-examined.

**Medical witness — opinion based upon medical authorities — books may be used — caution of court — as to evidence.**

11. Where, however, a medical witness has, in his examination in chief, based his opinion upon the medical authorities generally, rather than upon the result of his own personal experience, it is permissible in cross-examination to read to him portions of medical works, and to ask if he concurs therewith or differs therefrom, and to thus test his knowledge and reading and accuracy, even though he has not, in his direct or cross-examination, referred to any specific work. Where this is done, however, the proper practice is for the court to caution the jury that it is the testimony of the witness, and not what is read from the book, that constitutes evidence in the case.

Opinion filed October 10, 1914. On Rehearing December 23, 1914.

Appeal from the District Court of Cass County. Prosecution for bastardy. Judgment for plaintiff. Defendant appeals.

Reversed and new trial ordered.

Statement by BRUCE, J.

This is an appeal from a judgment of the district court of Cass county, and from an order denying a motion for a new trial, and which judgment determined that the defendant was the father of a bastard child, and ordered him to pay for its support the sum of $120 a year, quarterly, until the 10th day of August, 1917, and $150 a year thereafter until the 10th day of August, 1928, and to provide a bond in the sum of $2,250, or on default to be committed to the county jail.

*M. A. Hildreth,* for appellant.

Quotations from medical works may be incorporated in questions used in catechising an expert as to his technical knowledge. Hutchinson v. State, 19 Neb. 262, 27 N. W. 113; Sale v. Eichberg, 105 Tenn. 333, 52 L.R.A. 894, 59 S. W. 1020; Hess v. Lowrey, 122 Ind. 225, 7 L.R.A. 92, 17 Am. St. Rep. 355, 23 N. E. 156; Cronk v. Wabash R. Co. 123 Iowa, 349, 98 N. W. 885; State v. Holter, 32 S. D. 43, 46 L.R.A.(N.S.) 376, 142 N. W. 657; Tompkins v. West, 56 Conn. 478, 16 Atl. 237; State v. Coleman, 20 S. C. 441; Connecticut Mut. L. Ins. Co. v. Ellis, 89 Ill. 516; Williams v. Nally, 20 Ky. L. Rep. 244, 45

S. W. 874; Pinney v. Cahill, 48 Mich. 584, 12 N. W. 862; Brown v. Sheppard, 13 U. C. Q. B. 178; Eggart v. State, 40 Fla. 527, 25 So. 144; Bloomington v. Shrock, 110 Ill. 222, 51 Am. Rep. 678; Clark v. Com. 111 Ky. 443, 63 S. W. 740; State v. Winter, 72 Iowa, 627, 34 N. W. 475; State v. Wood, 53 N. H. 484.

It is proper in such cases for defendant to offer evidence of his good character. Defendant is presumed innocent; he is entitled to every reasonable doubt, and sometimes such evidence may be very valuable to a person charged with such offense. Fields v. State, 47 Ala. 603, 11 Am. Rep. 771; 1 Green, Crim. Rep. 635; Lowenberg v. People, 5 Park. Crim. Rep. 414; Hall v. State, 40 Ala. 698; People v. Ashe, 44 Cal. 288; People v. Lamb, 54 Barb. 342; Stover v. People, 56 N. Y. 315; State v. McMurphy, 52 Mo. 251.

It is highly competent for defendant to show that complaining witness had been with other men at times within the issue, and the opportunities for intercourse with others. To refuse such evidence was very prejudicial to defendant. Richards v. Ann Arbor, 152 Mich. 15, 115 N. W. 1047; Hedlum v. Holy Terror Min. Co. 16 S. D. 261, 92 N. W. 31; Graham v. McReynolds, 90 Tenn. 673, 18 S. W. 272.

The evidence as to the relations of the complaining witness with other men was highly important; it was competent. Burris v. Court, 34 Neb. 187, 51 N. W. 746; State v. Woodworth, 65 Iowa, 141, 21 N. W. 490; State v. Karver, 65 Iowa, 53, 21 N. W. 161, 5 Am. Crim. Rep. 88; State v. Borie, 79 Iowa, 605, 44 N. W. 824, 8 Am. Crim. Rep. 87.

*A. W. Fowler,* for respondent.

It would be an evasion of the general rule to permit counsel on cross-examination to read to the witness portions of medical works, and to ask the witness if he concurred in or offered a different opinion from the one read. Marshall v. Brown, 50 Mich. 148, 15 N. W. 55; People v. Millard, 53 Mich. 63, 18 N. W. 562; Bloomington v. Shrock, 1'0 Ill. 219, 51 Am. Rep. 678; State v. Winter, 72 Iowa, 627, 34 N. W. 475.

Such practice is, in effect, the same as offering the book in evidence. Jones, Ev. §§ 578, 579 and cases cited in note 91; Abbott, Trial Brief, p. 329.

It is competent to prove a promise of marriage, or that defendant led complaining witness to believe they were to be married, either

before or at the time of the intercourse. Laney v. State, 109 Ala. 34, 19 So. 531; Woodward v. Shaw, 18 Me. 304.

In such a case, the character of defendant is not in issue. Walker v. State, 6 Blackf. 1; Low v. Mitchell, 18 Me. 372; Houser v. State, 93 Ind. 228; Sidelinger v. Bucklin, 64 Me. 371; Stoppert v. Nierle, 45 Neb. 105, 63 N. W. 382.

It is proper to contradict the testimony of an expert medical witness, by referring to and reading into the evidence on cross-examination the very book of work used and referred to by the witness. Jones, Ev. § 579, and cases cited.

Where a ruling is wrong, and counsel is thereafter given full opportunity to cross-examine complainant on the same subject, the error is cured. Langford v. Issenhuth, 28 S. D. 451, 134 N. W. 894; Friedenwald v. Welch, 174 Mich. 399, 140 N. W. 564.

Proof of other acts of intercourse must be confined to the period of gestation. 2 Enc. Ev. 248 and cases.

Complainant's character for chastity, and her acts of intercourse outside the period of gestation, are not within the issues of such a case as the one here. Jones, Ev. § 153 and cases; Davison v. Cruse, 47 Neb. 829, 66 N. W. 823; Bookhout v. State, 66 Wis. 415, 28 N. W. 179; State ex rel. Clifton v. Granger, 87 Iowa, 355, 54 N. W. 79; Force v. Martin, 122 Mass. 5.

The uncorroborated evidence of complainant is sufficient to sustain a verdict. 2 Enc. Ev. 255, and cases; State v. Peoples, 9 N. D. 146, 82 N. W. 749.

BRUCE, J. (After stating the facts as above). Counsel for appellant has made seventy-eight assignments of error in this case, and states in his brief that these various assignments "will convince every unprejudiced mind that the defendant did not have a fair and impartial trial, and that the rulings of the court were highly prejudicial." We cannot see any merit in any of these assignments, and yet we do not plead guilty to prejudice in this matter, nor can we find anywhere in the record any indication of prejudice on the part of the learned trial judge.

The first assignment of error claims that it was prejudicial error for the trial court to refuse to permit the defendant to introduce testi-

mony showing that his reputation as to chastity and virtue prior to being arrested was good. In the case of State v. Brandner, 21 N. D. 310, 130 N. W. 941, the court has held that a bastardy proceeding which is brought under chapter 5 of the Code of Criminal Procedure is quasi-criminal in its nature, but that the legislature has provided in § 9653, Rev. Codes 1905, and had the constitutional right to provide, that the trial should be governed by the law regulating civil actions. Such being the case, we seem to have no option but to hold that in such cases the civil rule as to the admissibility of character evidence prevails; and that according to such rule, and except in the case of libel and slander, such evidence is inadmissible, seems to be overwhelmingly, if not universally conceded. Jones, Ev. § 148; Stopperd v. Nierle, 45 Neb. 105, 63 N. W. 382; Walker v. State, 6 Blackf. 1; Houser v. State, 93 Ind. 228; Low v. Mitchell, 18 Me. 372; 5 Cyc. 662; Sidelinger v. Bucklin, 64 Me. 371; 3 Am. & Eng. Enc.'Law, 884.

The cases cited by counsel for respondent, indeed, are all strictly criminal cases, involving offenses such as murder, larceny, and assault and battery; and though, in addition thereto we have been able to find the cases of Hawkins v. State, 21 N. J. L. 630, Dally v. Woodbridge Overseers, 21 N. J. L. 491, and Webb v. Hill, 115 N. Y. Supp. 267, which seems to hold to a contrary doctrine (and these are all which we can find), all of them treat the action as criminal, or at least quasi-criminal, and in none of them is to be found a reference to a statute such as ours, which provides that "the trial of such proceedings . . . shall be governed by the law regulating civil actions." Rev. Codes 1905, § 9653. The case at bar, indeed, seems to come squarely within the rule that in a civil action (and though quasi-criminal in its nature this action, as far as procedure is concerned, must be treated as a civil one), and except in the cases of slander and libel, the character of the defendant is not in issue, and that evidence in relation thereto is therefore inadmissible. Jones, Ev. § 148.

We find no reversible error in the rulings of the trial court on the cross-examination of the plaintiff's witness, Dr. Chagnon. It is argued that the doctor had testified on direct examination that the normal period of gestation is 270 days; that the medical authorities and physicians laid down as a minimum and maximum, 270, 260, and 265 days, or a few days over. He then testified, over the objection of the

defendant, that it was a fact that some of the physicians and text-books laid down a minimum as low as 249 or 285 days. He then testified that a child could be born at seven months, or eight months, and live, and that in his opinion, from the character of the child with respect to the quality of its nails and hair, it was a normal child.

On the cross-examination the following took place.

Defendant's counsel: Q. Let's see if you will agree with what I am going to read to you (reads). "The duration of pregnancy has an important bearing upon the questions of legitimacy and paternity. The signs of pregnancy, time of quickening, etc., have already been considered in another connection."

Plaintiff's counsel: Just a minute. If the court please, we object to this as not proper cross-examination. It doesn't seem to me counsel should read this. . . .

The court: Let's see the book, and I can see just what is coming. . . .

Plaintiff's counsel: Our objection is that it is not proper to use a medical book of this character on cross-examination.

The Court: Objection sustained.

Defendant's counsel: I would like to make a little offer of proof.

The Court: Well, all you want to do is to read from a book. You can ask him any question you have a mind to, bearing upon that subject, but the only extent of this rule is that you can't read from the book. . . .

Defendant's counsel: I can't use the book?

The Court: That is the point; you can't use the book. You can ask any question as to the subject-matter in controversy, but you can't read from the book.

Defendant's counsel: Then I understand, your Honor, it isn't permissible to examine an expert witness as to whether or not he agrees with certain language that is laid down in a treatise; is that the extent of your Honor's ruling?

The Court: You can ask that, but you can't read from the book.

Defendant's counsel: The defendant now offers to prove by questions to be put to this witness, based on the testimony of the other authors, that there isn't a case on record of a full-grown child where the period

28 N. D.—35.

of gestation was less than 265 days, and that in the case at bar the child was a full-grown child, and that the rule at common law and in the civil codes of the country fixes the period of gestation at 280 days, or, as some books say, 28 weeks, not less; and from that to 40 weeks; and I offer to read from a standard work on medical jurisprudence, and there form part of a hypothetical question to be put to the witness that the percentage as fixed by Athel's Table shows that the general rule is not less than 266 days, and that the maximum rule is 280 days, and that a child born at a period of 249 days would not and could not, according to medical jurisprudence, be a normal child, but would be an abnormal child; and I also in this connection maintain that in the direct examination of the witness by the state's counsel I am entitled under the rules of legitimate cross-examination to examine this witness thoroughly on that subject in the line that I have suggested to the court.

Plaintiff's counsel: Objected to upon the ground that it is not proper cross-examination, and irrelevant and immaterial, and that the rules of law do not permit the use of text-books in the manner sought to be used by counsel in his offer, and that the effect of the offer is to impeach the witness by the use of a text-book, and it comes squarely within the rule as laid down by all the authorities.

The Court: The court in ruling upon this question makes the following statement: At the time this objection was first interposed, counsel for the defendant, as will appear from the record, had in his hands a book entitled "Medical Jurisprudence, Student's Series, by M. D. Ewell," and had said book open at page 190, and was reading from ¶ 2 on said page, and, as stated by counsel, expected to read the balance of that paragraph, including what Dr. Tiddig said. The court believes that this method of procedure is contrary to the rule as laid down by Jones and other authorities, and especially as found in Jones on Evidence, 2d ed. p. 732, wherein the author states: "It would be a mere evasion of the general rule under discussion if counsel were allowed on cross-examination to read to the witness portions of such works, and to ask if he concurred in or differed from the opinions there expressed; hence this is not allowed." The same being supported by Marshall v. Brown, 50 Mich. 148, 15 N. W. 55; People v. Millard, 53 Mich. 63, 18 N. W. 562; Bloomington v. Shrock, 110 Ill. 219,

51 Am. Rep. 678; State v. Winter, 72 Iowa, 627, 34 N. W. 495, as appears by the note on said page 732. For the purpose of not being misunderstood, the court further states that he understands the rule will permit counsel for the defendant to ask the witness some of the questions which have been couched in his recent offer, with reference to the period of gestation,—as to the knowledge of the witness with reference thereto,—as based upon his study of the several works. That if he desires to offer any book in evidence the attention of the witness must be called directly to the statement of each author, and that the witness must have contradicted the author before the authority could be produced, and the same read to the jury. Now I think that it is also included within the rule.

Plaintiff's counsel: But I think the court has it wrong.

The Court: I don't so understand it.

Plaintiff's counsel: The rule is here stated, starting at the bottom of page 731 (reads). "But with reference to offering books in evidence the rule is that when an expert has given an opinion and cited a treatise as his authority, the book cited may be offered in evidence by the adverse party as impeaching testimony!"

The Court: That is what I intended to say.

Defendant's counsel: Counsel for the defendant desires to have the record show that he has no intention of offering this book in evidence; that his intention is to read from this book and from other like authorities, standard works on this subject, certain hypothetical questions to be put to this witness as applied to the case at bar, for the purpose of showing the jury that the child that is in controversy here was a full-grown normal child, and that under all the sound rules must have been begotten at a period of not less than 265 days and not to exceed 285 days, and that from the appearance of the child the witness is unable to state whether it was a 280-day child or 265-day child.

The Court: Well, I think that the record is complete enough. You don't misunderstand me, do you Mr. Hildreth?

Mr. Hildreth: No sir, I don't. I understand. I offer to examine this witness along the line above stated.

Plaintiff's counsel: This offer is objected to on the ground that the use of the text-books in the manner contemplated, namely, using them in framing hypothetical questions, is a mere evasion of the rule as

stated in Mr. Jones, and the effect is to use the text-book in impeachment of the witness on cross-examination, and that if any hypothetical questions are proper on cross-examination, or are to be framed and put to the witness, the counsel should not use, in the presence of the jury, the text-book in framing the questions, for the reason that it will necessarily and unquestionably have the direct effect upon the jury of leading them to believe that the text-book which the counsel is using and from which he frames his hypothetical questions are in direct conflict. Might just as well offer in evidence the text-book.

The Court: Objection sustained.

Counsel for defendant claims that he was unduly restrained in his cross-examination. We do not so hold, however, and have merely cited the proceedings at length because of the strenuousness of counsel's contention, and his constant imputation of prejudice on the part of the trial court. If counsel for defendant desired to refute the testimony of the witness by the use of the books in question, he should have first asked the witness if he based his opinion on any medical works, and, if so, on what; and then, and not till then, was he entitled to offer the book, or any book, in evidence for the purpose of impeaching this testimony. The rule is too well established to need amplification here. See Jones, Ev. § 578; Abbott, Civil Trial Brief, 329. And it is equally well established that it would be a mere evasion of the general rule if counsel were allowed on cross-examination to read to the witness portions of medical works, and to ask him if he concurred in or differed from the opinions there expressed. Marshall v. Brown, 50 Mich. 148, 15 N. W. 55; People v. Millard, 53 Mich. 63, 18 N. W. 562; Bloomington v. Shrock, 110 Ill. 219, 51 Am. Rep. 678; State v. Winters, 72 Iowa, 627, 34 N. W. 475. Such procedure, indeed, would be nothing more or less than impeaching the witness by a text-book on which he had in no way relied, and would be the same as offering in evidence the text-book read from. Jones, Ev. 2d ed. § 579.

But counsel for defendant further complains that in spite of this ruling the court permitted the plaintiff to introduce a certain work of Professor Edgar, upon the cross-examination of defendant's witness, Dr. Vidal. The ruling of the learned trial judge, however, was entirely correct, and it merely serves to illustrate the point under consideration,

and to make clear the distinction which is made by the authorities, and which was emphasized by the trial court; for in this instance the attention of the witness had been directly called to the book in question, and the matter came fully within the rule laid down by the authorities. A perusal of the record will, we believe, make this clear to all.

It is "Cross-Examination by counsel for plaintiff.

Q. Doctor, this question of the average period of gestation is a question concerning which there is a great deal of dispute in the medical profession, is there not? I mean by that, great deal of difference of opinion?

A. There is a few days. Matter of a few days in—between the best authorities; matter of two or three days one way or another. That is, some of the authorities lay down a lower average of gestation than others. That is true. I think I am familiar with a great number of authorities upon what the authorities hold upon this subject. I am familiar with what Professor Edgar holds. He is professor of Obstetrics in Cornell University. He is a leading authority on the subject in this country, and a very good authority.

Q. Do you recall what he lays down as the average period?

Defendant's counsel: Objected to as incompetent, irrelevant, and immaterial; improper cross-examination, and I assume that it is practically what I attempted to ask.

By the Court: Now, it just illustrates the objection. It is a perfect illustration of my rule. The objection is overruled. You may answer the question.

Exception by defendant.

A. I believe 274 days. I am not positive; but that would be my opinion. I am not positive that it wasn't 272, but that would be my impression.

Q. Well, to refresh your recollection, doctor, I will call your attention to the following language found at page 144 of Professor Edgar's work on the practice of obstetrics, 3d edition—1911 edition—which language reads as follows:

Defendant's counsel: Just a moment. I object to the counsel's using the book to cross-examine this witness. I haven't been permitted

to use any books, and I object to the testimony as being incompetent, irrelevant, and immaterial, and improper cross-examination. I haven't referred to this book in no way, and when I sought to ask him about this book, as I understood the Court to rule, I could not refer to it.

By the Court: Again the court holds with the rule laid down by Jones and others. This is cross-examination, and under the rule in cross-examination this is permissible. You may answer the question.

Plaintiff's counsel: I haven't quite finished. I didn't want to read until the court rules. (Continued reading): "We learn from experience that the average apparent duration of pregnancy is ten lunar or nine calendar months, or 40 weeks or 280 days from the beginning of the last menstrual period, or 272 days from the date of conception." Now, from that language, doctor, would you say that the average period of gestation from the date of conception, laid down by Professor Edgar, was 274 days or 272 days?

A. 272.

Counsel for defendant: Objected to—wait a minute, doctor. Objected to as incompetent, irrelevant, and immaterial; improper cross-examination.

The Court: Overruled. You may answer.

Exception by defendant.

A. 272. It reads from the book; it must be right. My impression was 274. I have a good many authorities; I haven't taken pains to look them up for a long time. Yes, the authorities differ. Some of them place it as low as 268 days; some 268 days; some 269 days; some 272 days. I testified that in my opinion the average number of days of gestation was 278. That is figuring from the first day of the last menstrual period. Assuming that a woman's menstrual period was November 16, 1911, you would figure this 278 days from that day. Now if the intercourse took place November 25th, or nine days later, then if I was going to figure the period of gestation from the date of intercourse, I would subtract 9 days from 278. That would make it 269 days from the period of intercourse to the date the child was born. But the 278 days I gave as a general rule dates from the first day of the menstrual period preceding, and if I was going to figure from the date of intercourse I would, of course, deduct the days between.

Q. And in the supposed case it would make it 269 days as the actual

period of gestation from the time of intercourse to the date of birth. Now, doctor, in arriving at this matter of average period of gestation, it is arrived at, is it not, by taking a number of cases and averaging them up?

A. Yes sir. That is all it amounts to. Supposing Professor Edgar in fixing his rule would take 1,000 cases of pregnancy and childbirth, there would be a number of cases that would be a great many days less than the average. Some of them, say, 250 days; some of them 252 days; some of them 254 days; some of them 258 days, and as you got up to the average the number of cases would increase at a given date. Some of them would run 274, 276, and so on, and he would take and add them all together, and divide it by the number of cases, and get the average.

We think there was no error in permitting the complaining witness to testify that the defendant had, before the acts of intercourse, complained of, led her to believe that they were to be married. This evidence tended to show the relationship of the parties, and was corroborative in its nature, just as much so in fact as evidence that the parties had been seen together at or about the times of the alleged intercourses.

There is no merit in the objection that defendant's counsel was not allowed to cross-examine the complainant in regard to her relations with the man Anderson. Even if the privilege was improperly denied in the first instance, the error, if any, was entirely cured by the granting of the privilege, and the full use thereof, later on in the trial, and when the plaintiff was recalled. Nor was there any merit in the contention that defendant was not allowed to question plaintiff as to presents alleged to have been given to her. The questions were very general, and hardly confined to the times in issue. There, too, must be some reasonable limit to cross-examination; and receiving presents is hardly in itself evidence of illicit relationship.

There is certainly no merit in appellant's contention that the trial court erred in his remarks to counsel during his argument to the jury, or that he thereby "emphasized his prejudice that he had manifested during the case." During counsel's argument he said to the jury: "This is H. F. Miller. I could say more. I couldn't say less. He is

an absolutely unreliable man, and an absolutely unreliable police magistrate." To this counsel for the state objects, saying: "Object to that statement. No evidence in the record to substantiate any such statement." The court thereupon said: "I think you will have to be a little careful, Mr. Hildreth, in the use of your words. You have a certain latitude, but beyond that, please don't go." Counsel for defendant then responded: "I didn't think I was going beyond the line," and the court continued: "Getting so close to it, it was dangerous." We really do not see what less the court could have said under the circumstances. In fact, we believe that he would have been justified in saying a great deal more. The remarks of counsel for the defendant were, indeed, entirely improper. There was, it is true, some question as to whether the witness Miller's version of what took place in the justice's court was the correct one, but there was absolutely no evidence in the record at all that he was *"an absolutely unreliable man, and an absolutely unreliable police magistrate."* Witnesses have at least some rights which counsel are bound to respect, and our legal system will soon break down if one subpœnaed in a lawsuit, and with no opportunity for a hearing or a defense, is subjected to the danger of not merely having his testimony in the particular lawsuit criticized and refuted, but of having his personal integrity and professional or business career assailed. The remarks of counsel, indeed, were not even "close to the line." They went far beyond it, and if the really restrained comment of the presiding judge was evidence of prejudice on his part, we might just as well do away with orderly court trials altogether, and return once more to the primitive but speedy and character-saving procedure of trial by battle. It is time, indeed, for all of us to cease imputing prejudice, and to realize that an honest difference of opinion can exist without prejudice and without ulterior motive.

It was not error to refuse to allow the complainant to testify on cross-examination as to whether she had asked the defendant to go over to Moorhead with her. The question in the first place was not proper cross-examination, as it did not touch upon any subject which was treated upon in the direct examination; in the second place, the time alleged was outside of the period of gestation, and the evidence could only have been asked for the purpose of injuring the plaintiff's

general reputation for chastity by proof of a specific act of unchastity, which cannot be done, for the simple reason that the very nature of the proceeding is at least to some extent an admission of unchastity, and such evidence would be merely diverting attention from the principal question to be tried. Jones, Ev. § 153; Rawles v. State, 56 Ind. 433; Davison v. Cruse, 47 Neb. 829, 66 N. W. 823. On the other hand, it was not improper to allow the witness to testify as to the giving of a ring by defendant to her, and the conversation relating thereto. Foundation for this evidence was not only laid in the cross-examination by defendant's counsel himself, but it was competent to show the general relationship of the parties.

We do not agree with counsel for appellant that the evidence is not sufficient to sustain the verdict. The plaintiff positively swore to sexual intercourse with the defendant on November 27th 1911; that she had a menstrual period on November 16th, and did not have it on December 16th, nor until after the child was born, on August 10, 1912. There, too, is corroborating evidence in the record, which, though not very strong or very conclusive, has yet some weight. We have no right to interfere with the verdict of the jury. State v. Peoples, 9 N. D. 146, 82 N. W. 749. It seems generally to be held, indeed, that in the absence of a statute it is not necessary to a conviction that the testimony of the complainant should be corroborated by other evidence. 2 Enc. Ev. 355.

Counsel next makes a general statement to the effect that the court's charge is erroneous. He, however, points out no particular portion of the charge which is subject to criticism. Nor does he give us any idea wherein its defects consist. This is nothing more or less than an abandonment of the objection. The same is true of the objection that the court erred in refusing to give the instructions asked for, and the assignment of error that "the court erred in denying the requests marked 1, 2, and 3" of the defendant, in the instructions to the jury. All that counsel says in his brief upon this proposition is that "these requests and instructions, when taken together, clearly indicate that the rights of the defendant were not safeguarded by instructions which the court should have given to the jury in a case of this character." It would certainly seem that this court should have something more

definite to pass upon, and that counsel for the respondent should have some specific allegations with which he could join issue.

Nor is there any merit in appellant's contention that no evidence was taken as to the earning capacity of the parties to the suit, nor of the "assistance" that the mother might be able to furnish in the maintenance and education of the child, and that therefore the judgment is invalid which orders the defendant to pay the sum of $120 a year until the 10th day of August, 1917, and $150 from that date to the 10th day of August, 1928. The statute (§ 9655, Rev. Codes 1905) expressly provides that the court, in cases of a verdict of guilty, "shall render such judgment as may seem necessary to secure, with the assistance of the mother, the maintenance and education of such child, until such time as the child is likely to be able to support itself. . . . The court may at any time, upon the motion of either party, upon ten days' notice to the other party, vacate or modify such judgment, as justice may require." This statute, of course, presupposes that the court shall reasonably acquaint himself with the necessities of the case, but it nowhere provides for the method nor how the information shall be obtained. Here the station in life, age, and occupations of all of the parties interested had been fully exposed upon the trial, and there was clearly no necessity for taking any further testimony. The sums ordered to be paid were certainly not excessive. So, too, not only did defendant's counsel, who appears to have been present at the time, take no exception to the methods pursued by the trial court, or make or ask permission to make any proof upon the subject, but the statute expressly provides "that the court may at any time, upon the motion of either party, upon ten days' notice to the other, vacate or modify such judgment, as justice may require."

The judgment of the District Court is affirmed.

## On Rehearing.

BRUCE, J. We are now satisfied that our original opinion must be modified and the judgment be reversed, and that the learned trial court erred in its rulings as to the cross-examination of Dr. Chagnon, and failed to distinguish between the use of medical books for the purpose of cross-examination merely, and to test the knowledge and reading and

accuracy of the witness who is upon the stand, and the use of such books in the examination in chief or in rebuttal, or by reading them, directly or indirectly, to the jury upon cross-examination, and not for the purpose of testing the learning, reading, or accuracy of the witness, but in order to get their contents and the opinions of their authors before the jury.

Although there is some conflict in the authorities and much obscurity of thought therein to be found, the distinction seems to be very clear. It is that, where the expert has testified from his own experience, and from his personal experience alone, and has not based his opinions upon any specific authorities or upon the authorities generally, the scientific treatise may not be read, either directly or indirectly, to the jury or to the witness in the presence of the jury, so that in any way their authority may be obtruded upon them. Hypothetical questions may, of course, in all instances, be framed from the books, but the books themselves should not be paraded before the jury. Brown v. Springfield Traction Co. 141 Mo. App. 382, 125 S. W. 236.

Where, however, the witness has not testified as to the results of his experience alone, but of his reading also, or where the subject under consideration is of such a nature that his opinion must necessarily be based upon his readings and the data and conclusions of the scientific authorities, rather than upon his individual experience, the witness may be cross-examined as to the authorities generally, and may be asked if he agrees with extracts which are read to him therefrom. This method of examination is allowed in these cases, not for the purpose of rebuttal, but to test the learning of the witness and the reliability and the nature of his data, and is permissible, even though no specific book has been referred to by him. It is allowed under the liberal rule which governs cross-examination, and not for the purpose of refuting the testimony of the witness by reading such authors into the evidence, which can only be done where the witness admits either in his examination in chief or in cross-examination that he has based his opinion upon such specific authors. See MacDonald v. Metropolitan Street R. Co. 219 Mo. 468, 118 S. W. 78, 16 Ann. Cas. 811. Where this is done, however, the proper practice is for the court to caution the jury that it is the testimony of the witness, and not what is read from the book, that constitutes evidence in the case. Ibid.

A distinction must be made between the cross-examination of a witness for the purpose of showing his lack of reading and training, and an attempt to overcome his evidence by reading medical works to the jury. The distinction is pointed out in the case of State v. Moeller, 20 N. D. 114, 126 N. W. 568, in which we said: "The fifth and sixth assignments of error relate to the sustaining of the state's objection to the following questions, asked one of the experts: 'Q. Don't you know that the text-books dealing with obstetrics and gynecology lay it down as a fact of not uncommon occurrence for a woman in a pregnant condition to inflict injuries upon the walls of the uterus, and cause similar conditions to those which were presented by the uterus described in this case?' and 'Q. Does not Hearst say in his text-book that injuries to the internal walls of the uterus resulting in septicæmia may be inflicted, and in fact not uncommonly are inflicted, by the pregnant woman herself?' These questions were propounded to Dr. Larson, who conducted the autopsy. He was a most intelligent witness, but his experience was limited, and his testimony was *based very largely upon knowledge gained from reading rather than from experience.* Had these questions been submitted for the purpose of eliciting information as to the contents of text-books primarily, the ruling of the court might be, and doubtless would have been, correct; but it is now claimed that they were submitted solely for the purpose of testing the accuracy of the witness's knowledge and the correctness of his conclusions as an expert, that necessarily his opinions were based upon reading medical works, and that their bearing was upon the weight which should be given his testimony. If this was the reason assigned in the trial court, the ruling was error."

When we apply these principles to the case at bar we become satisfied that the learned trial court erred in regard to the examination of Dr. Chagnon. It is clear from the record that Dr. Chagnon based his opinion largely upon his reading and upon the authorities, although he referred to no specific book. Counsel for defendant, then, should have been allowed to read to him from and to question him upon the medical authorities. "We cannot conceive," says the supreme court of Nebraska in the case of Hutchinson v. State, 19 Neb. 262, 27 N. W. 113, "that it would be possible, by any rule of evidence, to base the testimony in chief of the witness upon his experience in obstetrics. For

instance, the normal period of gestation, the probability of conception in the first act of intercourse, the length of the period of gestation in case of the first as compared with subsequent children, the number of days that ill health caused by uterine disorders would shorten the period of gestation, if at all, and many other prominent elements in the case presented by the defense, would naturally and inevitably require the witness to go outside of the domain of experience as an obstetrician, and it seems to us that he very properly and truthfully answered that his testimony was based upon *medical authorities*. For the purpose, therefore, of testing his recollection as well as his knowledge, it was proper to interrogate him as to the teachings of those authorities, and, in case his testimony was incorrect, to confront him with them in order that he might be corrected, and the jury thus be rendered able to judge of the weight to which his testimony was entitled. It is insisted that the testimony was inadmissible because 'the testimony of the witness shows that his opinion on the point in question was opposed to these same medical authorities.' As we have shown, the testimony entered the domain of science, and the ground upon which the objection is founded appeals most strongly to the mind of the writer as cogent reasons why the cross-examination was proper."

It is, indeed, upon this fact, or absence of fact, of the witness having based his opinion in chief upon what he had learned from the books, that the cases may be distinguished. In the case of State v. Blackburn the court said: "He (the witness) had not alluded to any authorities on his direct examination, as the witness had in Cronk v. Wabash R. Co. 123 Iowa, 349, 98 N. W. 885; *nor had he based his opinion on what he had learned from the books,* as in State v. Donovan, 128 Iowa, 44, 102 N. W. 791, and for this reason asked, as in Hutchinson v. State, 19 Neb. 262, 27 N. W. 113, what the several authorities taught. . . . In Connecticut Mut. L. Ins. Co. v. Ellis, 89 Ill. 512, the expert had said that he had read text-books in order to be able to state why he had diagnosed the case as delirium tremens, and paragraphs were read to him, and inquiry was made as to whether he agreed with the authors. *This was approved on the ground that he had assumed to be familiar with the authors, and in no better way could his knowledge on the subject be tested. . . .* In the case at bar the physician *had based his opinion solely on his own experience and observation,* and therefore it

was error to cross-examine him on the state of the medical authorities, in order thereby to get their supposed teachings before the jury. . . . Moreover, the inquiry was not one depending so much on skill in the profession as upon observation in its practice."

In the case of State v. Winter, 72 Iowa, 627, 34 N. W. 475, the question was asked upon the examination in chief, and not upon cross-examination. "He, [the witness]" the court said, "was then asked the following question: 'Have you read the article by Dr. Casselman, in the American Journal of Insanity, in which the author says, Mania,—instantaneous, temporary, fleeting,—a disease which breaks out suddenly like the sudden loss of sense by some physical disease; the subject is urged in a moment to automatic action, which would not have been foreseen?' If you say you have read the above quotation, state whether the same agrees and accords with your knowledge and experience on the subject.' On the objection of the district attorney the court excluded the question. It is not claimed that the question was asked with the view of laying the foundation for the introduction in evidence of the article referred to, but the object was to elicit the opinion of the witness. It will be observed, however, that the answer of the witness (which we assume would have been in the affirmative) would have been but a reiteration, in another form, of the opinion he had already expressed. He had already testified to the existence of the very form of mania referred to in the article. The fact or theory sought to be established was material and important, but as the witness had already clearly expressed his opinion as to its truth, the court did not abuse its discretion in refusing to allow the question, which, as we have said, sought only to elicit a reiteration of that opinion. The same witness was asked the following question, which the district court ruled was incompetent: 'State whether delusion or transitory mania is a condition recognized by medical authorities.' *It would be admissible, perhaps, on the cross-examination of a medical expert,* to inquire of him as to the teachings of the authorities in his profession. The object of such examination, however, would be to test the accuracy of the expert's knowledge. But the question in this case was asked not with this view, but for the purpose of proving that the theory in question is taught by the authorities. But the works themselves were admissible in evidence, and they are the only competent evidence of what they teach."

In the case of Connecticut Mut. L. Ins. Co. v. Ellis, 89 Ill. 516, the court on page 519 said: "On the other point made, no medical books were read to the jury as evidence or for any other purpose, and it will not be necessary to discuss the admissibility of such evidence. But on cross-examination of the attending physician, who made a diagnosis of the disease of which the assured died, and pronounced it delirium tremens, paragraphs from standard authors that treat of that disease were read to the witness, and he was asked whether he agreed with the authors, and that is complained of as error hurtful to the cause of defendant. The testimony of this witness was of the utmost importance, and certainly plaintiff was entitled to reasonable latitude in the cross-examination. The witness had given the symptoms of the disease with which the assured was affected, and pronounced it delirium tremens, and as a matter of right, plaintiff might test the knowledge possessed by the witness, of that disease, by any fair means that promised to elicit the truth. It will be conceded, it might be done by asking proper and pertinent questions, and what possible difference could make whether the questions were *read out of a medical book or framed by counsel for that purpose.* Ordinarily, the limits of cross-examination of a witness are within the sound discretion of the court, and usually the greatest latitude is allowable that can be consistently given, for the discovery of the truth. *The witness in this case stated that he had read text-books that he might be able to state why he 'diagnosed the case as delirium tremens.' Assuming to be familiar with standard works that treat of delirium tremens, it was not unfair to the witness to call his attention to the definitions given in the books, of that particular disease, and asking him whether he concurred in the definitions.* How could the knowledge of the witness, of such subjects, be more fully tested? That is, in no just sense, reading books to the jury as evidence, or for the purpose of contradicting the witness. The rule announced may be liable to abuse. Great care should always be taken by the court to confine such cross-examination within reasonable limits, and to see that the quotations read to the witness are so fairly selected as to present the author's views on the subject of the examination. That the cross-examination was in the presence and hearing of the jury could not, of course, be avoided, as the witness was examined in

open court. No material error appearing in the record, the judgment must be affirmed."

In the case of MacDonald v. Metropolitan Street R. Co. 219 Mo. 468, 118 S. W. 78, 16 Ann. Cas. 811, the court said: "In framing questions on the cross-examination of experts, counsel held in hand medical books, and formulated questions from their language. The books were not read to the jury, but the jury could see that the examiner read from them. This method of cross-examination was objected to. The court, over objections, permitted plaintiff's counsel to adopt the scientific terminology of the author, and put the propositions to witnesses obviously asserted by him, but repeatedly cautioned the jury that what was read from the book was not evidence, and the jury should pay no attention to it; that the only thing they could consider was the evidence that fell from the lips of the witness along the line of verifying the propositions put by the examiner. Samples of these cautionary instructions are as follows (The court): 'The jury will not give any more weight to anything Mr. Karnes reads from the books than they would to any other questions Mr. Karnes asks, unless the witness answers questions in the affirmative, thereby making it evidence in the case. . . . It is the answers of this witness, gentlemen of the jury, that is evidence in this case, and not the questions.' Error is assigned on this phase of the trial, but the point is without soundness. It has been said that it is within the discretion of the court to permit medical books to be read to the jury (State v. Soper, 148 Mo. 1, c. 235, 236, 49 S. W. 1007, but undoubtedly the better and generally accepted doctrine is that the contents of such books are not admissible as independent evidence. [17 Cyc. 421; Union P. R. Co. v. Yates, 40 L.R.A. 553, 25 C. C. A. 103, 49 U. S. App. 241, 79 Fed. 1. c. 587 et seq.] Judge Thayer in the last case puts the grounds of exclusion on, first, such evidence is not delivered under oath; second, there is no chance of cross-examining the author; third, medicine is not an exact science, doctors disagree, medical theories are subject to frequent modification and change. But while not independent evidence, and the question is a vexed one, yet there is a legitimate use of such books, at least on cross-examination, where the testimony has taken wide range and where skilled witnesses testifying as experts base their testimony on their knowledge derived from books as well as experience, as in this

case. Here, defendant's counsel had notified some of his witnesses that he was appealing to, and asking his doctors to draw from, their medical knowledge running back, say, two thousand years, and which could only be preserved, if at all, in book form, from the days when Socrates ordered a cock sacrificed to Esculapius, the god of medicine, and Hippocrates and Galen practised physic in Greece and Italy. Under such circumstances, we see no reason why counsel could not frame a proposition in medical science in the exact language of the author, and ask the witness whether he agreed to it, so long as this was done under the due guard of the cautionary instructions given by the court. Such is the doctrine of a learned and exhaustive note on § 440, Greenleaf on Evidence, 15th ed. p. 579, where it is said: 'Moreover, it is a proper method of cross-examination, in order to test the learning of a witness who testifies as an expert, to refer to books of approved authority upon the subjects under investigation, and question him in regard to them.' Mr. Justice Scott, in Connecticut Mut. L. Ins. Co. v. Ellis, 89 Ill. 1; c. 519, gives that proposition the indorsement of his strong pen, though stating that the rule is liable to abuse, and great care should be taken to prevent such abuse. He there says: 'Assuming to be familiar with standard works that treat of delirium tremens, it was not unfair to the witness to call his attention to the definitions given in the books, of that particular disease, and asking him whether he concurred in the definitions. How could the knowledge of the witnesses of such subjects be more fully tested? That is, in no just sense, reading books to the jury as evidence, or for the purpose of contradicting the witness.' To the same effect is Hess v. Lowrey, 122 Ind. 1. c. 233 et seq., 7 L.R.A. 92, 17 Am. St. Rep. 355, 23 N. E. 156. In State v. Wood, 53 N. H. 1. c. 494, 495, Sargent, Ch. J., speaking to the point, said: 'As to Dr. Ferguson's cross-examination, we see no reason for any objection to it. He had stated, as well he might, on direct examination, his knowledge of a particular subject, not from any experience or actual observation, but from what he had derived merely from reading and studying medical authorities. Then he was cross-examined as to that general reading, not by putting in the books, but by inquiries whether, in his general reading, he had not found particular theories laid down conflicting with the theory he had advanced as the result of his reading.' Collier v. Simpson, 5 Car. & P. 73, goes further than the present case.

28 N. D.—36.

There Tindal, Ch. J., in speaking of a medical expert, says: 'I think you may ask the witness whether in the course of his reading he has found this laid down.' And that was upon direct examination. The Chief Justice further says, 'I do not think that the books themselves can be read, but I do not see any objection to your asking Sir Henry Halford (the witness who was the president of the College of Physicians) his judgment and the grounds of it, which may be in some degree founded on books, as a part of his general knowledge.' We rule the point against defendant."

In the North Dakota case of Kersten v. Great Northern R. Co. ante, 3, 147 N. W. 787, and where an examination of the record discloses the fact that the doctor had expressly stated that he had based his opinion upon the medical writers, the court said: "The fourth complaint of appellant relates to the cross-examination of defendant's witness, Dr. Sihler. The doctor had given his opinion as to the effect upon the brain of a blow delivered directly above the injury. Upon cross-examination he was asked whether or not certain medical textbooks and authorities sustained a doctrine contrary to that held by the witness. It appears that the text-book to which reference was made was offered to the witness, and that the author at that time was a teacher of surgery in Johns Hopkins University. Thus the cross-examination was evidently in good faith to test the accuracy of the conclusion given by the expert who was upon the stand. Great latitude should be allowed in the cross-examination of experts to test their credibility and knowledge. Dilleber v. Home L. Ins. Co. 87 N. Y. 79; McFadden v. Santa Ana, O. & T. Street R. Co. 87 Cal. 464, 11 L.R.A. 252, 25 Pac. 681; Jones, Ev. 2d ed. § 389; Davis v. State, 35 Ind. 496, 9 Am. Rep. 760. We think the cross-examination proper." See also State v. Moeller, 20. N. D. 114, 126 N. W. 568; MacDonald v. Metropolitan Street R. Co. 219 Mo. 468, 118 S. W. 78, and note thereto in 16 Ann. Cas. 810, 818.

In the case of Hess v. Lowrey, 122 Ind. 225, 7 L.R.A. 90, 17 Am. St. Rep. 355, 23 N. E. 156, we find the following: "Complaint is also made that the court erred in admitting in evidence extracts from certain books or treatises on surgery. It does not appear that extracts from the books were read in evidence, or admitted in evidence as such. In the cross-examination of a medical expert, the witness was asked

whether certain statements were not made by certain writers on surgery, the statement referred to being *read from a book held by counsel, as part of the question.* It is recognized as a proper method of cross-examination, in order to test the learning of a witness who testifies as an expert, to refer to books of approved authority upon the subjects under investigation. Ripon v. Bittel, 30 Wis. 614; Connecticut Mut. L. Ins. Co. v. Ellis, 89 Ill. 516; Pinney v. Cahill, 48 Mich. 584, 12 N. W. 862; State v. Wood, 53 N. H. 484; Rogers, Expert Testimony, §§ 181, 182. The opinion of a witness may be tested by a cross-examining counsel by reading from medical books. 2 Best, Ev. pp. 882–884. Medical books may be read to the jury, not for the purpose of proving the substantial facts therein stated, but to discredit the testimony of experts who refer to books as authority for or in support of their opinions. Pinney v. Cahill, 48 Mich. 584, 12 N. W. 862."

In Fisher v. Southern P. R. Co. 89 Cal. 399, 26 Pac. 894, 9 Am. Neg. Cas. 104, we find the following: "On cross-examination of Woolsey, a witness called as an expert by defendant, plaintiff's counsel was allowed, against the objection of defendant, to read statements from medical works, and to ask the witness if he agreed with the authors. This is assigned as error. Plaintiff's counsel defends the ruling here, on two grounds: (1) That the witness, on his direct examination, testified to certain medical opinions and supported his statements by the assertion that they conformed to the authority of medical works; and he claims that the rule is that if the witness, either in direct or cross examination, relies in any manner upon the authority of medical works, generally or specifically, it is proper cross-examination to confront him with the works upon which he relies, to show that his understanding of them is incorrect, or to contradict him; and (2) that it is proper cross-examination to test the competency of the witness as an expert, or the value of his opinions. A careful examination of the evidence has convinced me that the rulings complained of cannot be defended upon either of these grounds, though the legal proposition be admitted. As to the first, it is plain that some of the extracts read have no reference to any opinions of the witness which he sought to sustain by a reference to medical writers, either generally or specifically, except in response to a direct question by plaintiff referring to such writers. As to the second ground, it is not so plain. The value of an effective

cross-examination as a means of showing the incompetency of a wit-ness or his lack of integrity and the true value of his testimony can hardly be overrated; and this is true in a special sense as to expert testimony, where the party may choose from the body of a profession those whose opinions are most favorable. It is quite natural, and cer-tainly common, for one called as an expert to enhance his authority by his power of self-assertion, and there is reason to fear that these opin-ions are not always as impartial and indifferent as a judicial utter-ance should be. While it is to be regretted if in the proper exercise of the right of cross-examination it shall appear that certain medical writers of repute differ from the witness, and so a party will get the benefit of unsworn testimony, *still this evil, unavoidable in the nature of things, is, in my opinion, not at all commensurate with that which would deprive a party in such a case of the best touchstone known to legal science, by which to estimate the value of testimony.* And if, on general principles, such questions are legitimate on cross-examination, I do not see how a party can be deprived of his right because such evil consequences may follow. All the works on medical jurisprudence which I have examined seem to sustain this position, and some cases, although they are not uniform. Brodhead v. Wiltse, 35 Iowa, 429; Connecticut Mut. L. Ins. Co. v. Ellis, 89 Ill. 516; Ripon v. Bittel, 30 Wis. 614; Pinney v. Cahill, 48 Mich. 584, 12 N. W. 862; State v. Wood, 53 N. H. 484. But since consequences are likely to follow which admittedly should be avoided if possible, *such examination should be strictly limited to this one purpose,* for which only it can be per-mitted. *I think no fair-minded person can closely study this record without being convinced that the evidence was not put in with any such purpose.* No doubt counsel offered it under the impression that it was justified as inconsistent with opinions which the witness had claimed were sustained by medical authorities. I have shown that the claim cannot be sustained on that ground. In fact, although the witness took issue with some statements read, they cannot fairly be said to contradict his evidence in any respect. *They were evidently intended as evidence for the plaintiff, to sustain his theory of the case, and not to affect the competency of the witness or the value of his testimony.* As it seems to me a new trial must be granted for this error, it becomes unnecessary to review the other assignments."

In Greenleaf on Evidence, 16th ed. vol. 1, p. 269, § 162K, we find the following: "It has been thought by some courts that an expert witness may be discredited by reading an opposite opinion from a professional treatise, or by being asked whether opposing views have not been laid down by writers, or whether he agrees with certain opposing opinions then read; . . . and it is generally held that it cannot be done, except that where a witness has referred to a treatise, *or to writers generally,* as agreeing with him, the treatise may be shown not to agree with him, just as any other assertion of a witness may be disproved."

In the case of State v. Wood, 53 N. H. 484, the witness (Dr. Ferguson) had several books upon the table during his direct examination, and was apparently about to read from them when he was prevented by the objection of the state. "Upon cross-examination, counsel for the state proposed several questions similar in form to the following: Have you found, in the course of your reading or study, this sentiment in regard to oil of savin (then reading from a sheet of writing paper in his hand): 'Death in an hour after taking it?' Have you also found this: 'A woman took one hundred drops of oil of savin every morning for twenty days and went full time?' or this: . . . 'Almost fatal consequences in producing abortion?' or this: 'Its properties to produce abortion have been denied by late authors, of weight and reputation?' or this: 'Has no action as an abortive except like other irritants?' The respondent objected that, if he could not be permitted to put in the books themselves, such questions were inadmissible; but the state were allowed to put the questions, subject to exception, and the witness answered several of them in the affirmative. Subsequently, upon redirect examination, the respondent asked several questions similar in form to the above, as to the existence in the books of statements tending to confirm the testimony of the witness on his direct examination."

The court on page 494 of its opinion said: "As to Dr. Ferguson's cross-examination, we see no reason for any objection to it. *He had stated, as well he might, on direct examination, his knowledge of a particular subject, not from any experience or actual* observation, *but from what he had derived merely from reading and studying medical authorities.* Then he was cross-examined as to that general read-

ing, not by putting in the books, but by inquiries whether, in his general reading, he had not found particular theories laid down conflicting with the theory he had advanced as the result of his reading. Collier v. Simpson, 5 Car. & P. 73, goes further than the present case. There Tindal, Ch. J., in speaking of a medical expert, says: 'I think you may ask the witness whether in the course of his reading he has found this laid down.' And that was upon direct examination. The chief justice further says: 'I do not think that the books themselves can be read, but I do not see any objection to your asking Sir Henry Halford [the witness who was the president of the College of Physicians] his judgment and the grounds of it, which may be in some degree founded on books, as a part of his general knowledge;' and see 1 Wharton, Crim. Law, 6th ed. § 50. It is settled, in Taylor v. Grand Trunk R. Co. 48 N. H. 304, 2 Am. Rep. 229, that a physician may give his opinion as an expert upon a subject concerning which he has had no practical experience, and where his knowledge is derived from study alone. This case, we think, fully sanctions the direct examination of this witness upon a subject where his knowledge was *derived from books alone;* and the cross-examination was *simply the testing of the* correctness of his opinion by the *same standard upon which the* opinion was founded,—*the authority of the medical books which he had read.* We think this ruling was right."

In speaking of this opinion, and in a case in which the general rule was announced that "an expert medical witness cannot be discredited by reading an opposite opinion from a text-book in the presence of the jury, and asking him whether it is correct, where he has in no way referred to the book to sustain his opinion or otherwise relied on it," the supreme court of North Carolina, in the case of Butler v. South Carolina & G. Extension R. Co. 130 N. C. 15, 40 S. E. 770, said: "The last one [the opinion in question] relates to a cross-examination upon matters which the witness testified he had learned from certain medical authorities, *not from experience or actual observation.* The books were put in evidence,—were excluded—and the court held that upon the cross-examination counsel could be allowed to ask if the witness had not found particular theories laid down conflicting with the theory he had advanced as the result of his reading."

In the case of Pinney v. Cahill, 48 Mich. 584, 12 N. W. 862, the

court said: "The rule is acknowledged in this state that medical books are not admissible as a substantive medium of proof of the facts they set forth. But the matter in question was not adduced with any such view. The witness assumed to be a person versèd in veterinary science; to be familiar with the best books which treat of it, and among others the work of Dodd. He professed himself qualified to give an opinion to the jury from the witness stand on the ailment of the plaintiff's horse and its cause, and the drift of his opinion was to connect the defendant with that ailment. He borrowed credit for the accuracy of his statement by referring his learning to the books before mentioned, and by implying that he echoed the standard authorities like Dodd. Under the circumstances it was not improper to resort to the book, not to prove the facts it contained, but to disprove the statement of the witness, and enable the jury to see that the book did not contain what he had ascribed to it. The final purpose was to disparage the opinion of the witness, and hinder the jury from being imposed upon by a false light. The case is a clear exception to the rule which forbids the reading of books of inductive science as affirmative evidence of the facts treated of. Ripon v. Bittel, 30 Wis. 614; 2 Whart. Ev. § 666."

In the case of Byers v. Nashville, C. & St. L. R. Co. 94 Tenn. 345, 29 S. W. 129, the court said: "But we are of opinion that the objections to the use of the book as first made were not well taken. The admission of such evidence is a matter largely in the discretion of the court, as well as the mode of conducting the examination. The witness Fravel was testifying not only as to the facts connected with the running of his train when the killing occurred, but also as an expert engineer, acquainted with and competent to testify as to the running of trains generally. *When a witness is testifying as an expert, it is competent to test his knowledge and accuracy upon cross-examination by reading to him, or having him read, extracts from standard authorities upon the subject-matter involved, and then asking him whether he agreed or disagreed with the authorities,* and comparing his opinion with those of the writer. Hess v. Lowrey, 122 Ind. 568, 7 L.R.A. 90, 17 Am. St. Rep. 355, 23 N. E. 156; Fisher v. Southern P. R. Co. 89 Cal. 399, 26 Pac. 894, 9 Am. Neg. Cas. 104; Richmond & D. R. Co. v. Allison, 86 Ga. 145, 11 L.R.A. 43, 12 S. E.

352; 1· Greenl. Ev. 15th ed. § 440, note. *We think it therefore admissible for the attorney to use the book in shaping his questions,* and it was not error for him to require the witness to examine and *read portions of the book* with a view of testing his knowledge by proper questions; and this, so far as the record shows, is all that was attempted to be done in the first examination when the objection was made. *But reading the book to the jury as evidence of the facts therein stated,* and *as a general rebuttal of the testimony of the expert, stands on a different basis.* It does not appear that this was done during the examination and cross-examination of the defendant's witnesses, but after they were through. Then the book was introduced again by the plaintiffs' counsel, and several pages read to the jury, and no objection was at this time made. In the absence of such objection made when the book was thus offered and read for this purpose and in this way, there is no reversible error. See 1 Greenl. Ev. 15th ed. § 440, note e, in which the following propositions are laid down, and cases cited in support: 'The weight of current authority is decidedly against the admission of scientific books in evidence before a jury, and allowing such books to be read from to contradict an expert generally. *However, it is a proper method of cross-examination, in order to test the learning of a witness who testifies as an expert, to refer to books of approved authority upon the subject under investigation, and question him in regard thereto.* Scientific books may be used by the attorney in *framing his questions* for the witness. He may read the question from *such a book to the witness, either on direct or cross examination.* Thompkins v. West, 56 Conn. 485, 16 Atl. 237. And if an expert has *quoted* a book, it may be read to him to show that he has misquoted it. Underhill, Ev. § 189; Ripon v. Bittel, 30 Wis. 614."

In the case of Clukey v. Seattle Electric Co. 27 Wash. 70, 67 Pac. 379, the court said: "The sixth assignment embraced an objection to the manner in which the attorney for respondent conducted the cross-examination of the medical experts appointed by the court. The counsel asked the expert if such authorities did not lay down certain rules,—reading the language of the rule from the *author's work,*—and it is contended that it is an infraction of the rule of evidence against the admission of medical authorities. But we do not think the rule of law was announced to meet the practice of the kind complained of.

These questions were propounded *upon cross-examination for the purpose of testing the knowledge of the expert.* It would have been competent for the attorney to have stated supposititious cases to the experts. He could properly have stated the rule from memory, asking the expert if such an author did not lay down such a rule. It seems there could be *no tenable objection to his reading the rule to the expert. In fact, it is a more exact method, and less liable to make a wrong impression on the mind of the juror, than to cross-examine from memory.*"

In the case of Brown v. Springfield Traction Co. 141 Mo. App. 382, 125 S. W. 236, the court said: "From the MacDonald Case, as well as from authorities of other states, we glean the correct rule to be that an attorney may use a medical book to aid him in framing questions to be asked of a physician testifying as an expert, but it is not permissible to read from such books to the jury, and the court did not err in refusing permission to defendant's counsel to read from such books to the jury in this case."

Again in the case of Louisville, N. A. & C. R. Co. v. Howell, 147 Ind. 266, 45 N. E. 584, we find the following: "Some contentions made by appellant seem to be based upon a misapprehension of the facts disclosed in the record. Objection, for example, is made to the exclusion of certain evidence sought to be elicited from Dr. Murphy, one of appellant's witnesses. In the course of his re-examination this witness was asked by appellant's counsel what was said in a certain named medical authority as to the difference between necrosis and caries of the bone, with a view to determine which of these diseases was indicated by the discharges from appellee's wound; and counsel cited authority to show that on cross-examination, such questions are proper. There is no doubt that, in order to test an expert's knowledge, it is proper, on cross-examination, to read *statements from writers of repute,* who have treated of the subject concerning which the expert has testified, and ask him questions touching the views advanced by such text-writers. Hess v. Lowrey, 122 Ind. 225, 7 L.R.A. 92, 17 Am. St. Rep. 355, 23 N. E. 156. The trouble with appellant's contention is that the question here asked was not on cross-examination, and the evidence thus sought was but of a self-serving character."

Again, in the case of Sale v. Eichberg, 105 Tenn. 333, 52 L.R.A.

894, 898, 59 S. W. 1020, we find: "The third assignment is that the court erred in excluding, on cross-examination of Dr. Raymond, one of plaintiff's witnesses, the *reading of extracts from the standard work of* Dr. Hamilton as to diagnosis and treatment of fractures like that of Eichberg. . . . Counsel stated he did not propose to introduce the book itself as evidence, but simply wished to test the witness as an expert, and the accuracy of his opinion and statements. It was held by this court in Byers v. Nashville, C. & St. L. R. Co. 94 Tenn. 350, 29 S. W. 128, *viz.,* 'when a witness is testifying as an expert it is competent to test his knowledge and accuracy, on cross-examination, *by reading to him or having him read extracts from standard authorities upon the subject-matter involved, and then asking him whether he agrees or disagrees with the authorities,* and then by comparing his opinion with those of the writer.' See also, Stoudenmeier v. Williamson, 29 Ala. 558. It is true the witness, after having been examined at great length in chief, finally, on cross-examination, said he did not claim to be an expert. The witness was a practising physician, and had expressed his opinion quite freely in respect of good practice and proper treatment in such cases. The defendant was entitled, on cross-examination, to test the witness's knowledge in the manner indicated, and the court was in error in excluding the question propounded."

There can, indeed, be no doubt that the modern tendency, and certainly the tendency of this court is towards the freedom of cross-examination and quite a wide latitude therein. See Kersten v. Great Northern R. Co. ante, 3, 147 N. W. 787; State v. Moeller, 20 N. D. 114, 126 N. W. 568; State v. Apley, 25 N. D. 298, 48 L.R.A. (N.S.) 269, 141 N. W. 740. A distinction, however, must be made between legitimate cross-examination and an underhanded attempt to read the authorities to the jury. We think there was no such underhanded attempt in the case at bar, and that, though in the colloquy which afterwards ensued between court and counsel, and in a portion of the subsequent offer, counsel intimated that such could be done, it is clear to us that the primary purpose of the reading in the first instance was cross-examination, and cross-examination alone. If this was the case, and the ruling which prevented the reading in the first instance was incorrect, the rights of the defendant should not be jeopardized merely because, in addition to the reason which was first ad-

vanced therefor, others were subsequently asserted which were unsound. There can, we may add, be no distinction made between asking a physician if an author does not make some particular statement, and then asking the witness what he thinks of the statement, which we inferentially at least held could be done in the case of State v. Moeller, supra, and the reading of the statement to the witness directly from the book in the first instance, and asking his opinion thereon.  Williams v. Nally, 20 Ky. L. Rep. 244, 45 S. W. 874; Connecticut Mut. L. Ins. Co. v. Ellis, 89 Ill. 516.

The case at bar, then, comes within the permission, and not within the condemnation, of the decision.  It is true that in his subsequent offer counsel asserted the right to use the books as evidence in themselves, but this was only in a part of his offer, and he closed by saying: "And I also in this connection maintain that I am entitled, under the rules of legitimate cross-examination, to examine this witness thoroughly on that subject in the line that I have suggested to the court."  It is to be remembered, indeed, that he was interrupted as he was reading a statement from the work after the preparatory question, "Let's see if you will agree with what I am going to read to you," and though he seems in no way to have unnecessarily paraded the book, the court in answer to the question, "Then I understand, your Honor, it isn't permissible to examine an expert witness as to whether or not he agrees with certain language that is laid down in a treatise," answered, "You can ask that, but you can't read from the book."  Counsel for defendant then said:  "Counsel for defendant desires to have the record show that he has no intention of offering the book in evidence; that his intention is to read from other like authorities, standard works on this subject, certain hypothetical questions to be put to this witness as applied to the case at bar, for the purpose of showing the jury that the child that is in controversy here was a full-grown normal child, and that under all the sound rules must have been begotten at a period of not less than 265 days and not to exceed 285 days, and that from the appearance of the child the witness is unable to state whether it was a 280-day child or a 265-day child."

The door, indeed, seems to have been opened wide for cross-examination when on the direct examination of plaintiff's witness, Dr. Chagnon, the witness was allowed to testify that *the medical authorities*

*and physicians* laid down as a maximum and minimum 270, 260, and 265 days, or a few days over;" and still further when he was allowed to correct himself, and in answer to a leading question, and over the objection of defendant's counsel, to state that "it was a fact that some of the physicians and text-books laid down in minimum as low as 249 to 285 days."

When we come to the testimony of Dr. Vidal, and for the reasons heretofore mentioned, we think the learned trial court committed no error. There was really no material difference in the two cases. Dr. Vidal had, it is true, on direct examination, referred to no particular authority, nor did he even on cross-examination agree with the authority read. He had, however, as in the case of Dr. Chagnon, based his opinion on the authorities generally, and it was merely proposed to examine him in regard thereto, and to read to him from them for that purpose. We now approve of the examination, not for the reason given in our original opinion, and of which we now entertain some doubt, but because the doctor had expressly stated that his opinion was based upon his readings and upon the authorities, and it was therefore perfectly permissible to show upon cross-examination that his memory of what those authorities held was inaccurate, and to generally test the accuracy and extent of his reading and research.

It is true, there are some authorities which hold to a contrary rule to that which we have herein expressed. They are, however, few in number. Among them is the case of Mitchell v. Leech, 69 S. C. 413, 66 L.R.A. 723, 104 Am. St. Rep. 811, 48 S. E. 290. In this case the court said: "The eleventh exception will next be considered. The record shows that the question arose in the following manner: 'Doctor, is Lydson a standard medical work on genitourinary and venereal and sexual diseases? (Mr. Hart: I object. Medical books are not evidence, except in cases of insanity. Medical books are not evidence in cases of this character.) Q. I will ask him if that is good authority? (Mr. Hart: I object to that. Mr. Brice: This is an expert witness, and the witness had stated that the authorities, medical authorities—that is what the witness means—state that a man can have an injury so slight as not to be noticed at the time, and yet serious results follow. I am not introducing the authority. I am simply asking him whether this is an authority. The Court: The object of the question is to

introduce the book? Mr. Brice: I am simply going to ask him if this is an authority, and read him a piece, and ask him if that is good authority or not? The Court: That introduces the book. You wish to contradict or qualify the opinion of the doctor on the stand. Otherwise it would be irrelevant. Testimony excluded. (Exception taken.)' The presiding judge simply ruled that you could not contradict or qualify the opinion of the doctor on the stand by showing what some author had said. In this there was no error."

The case of Butler v. South Carolina & G. Extension R. Co. 130 N. C. 15, 40 S. E. 770, seems also to more or less bear out the point contended by the plaintiff. In it, however, there is no proof that the doctor in his direct examination based his opinion *upon the authorities generally*. The same is true of the case of City of Bloomington v. Shrock, 110 Ill. 219, 51 Am. Rep. 678.

In the case of Chicago City R. Co. v. Douglas, 104 Ill. App. 41, the books were sought to be read *on the examination in chief,* and the case therefore is not in point. In the case of Hall v. Murdock, 114 Mich. 233, 72 N. W. 150, the books were actually read to the jury.

We, too, are not unmindful of the § 579 (595) of Jones on Evidence, on which the trial court based his conclusions, and which states that "it is generally conceded, however, that where experts are examined as to questions of science they may give their opinions and the ground and reason therefor, although they state that such opinions are in some degree founded upon treatises on the subject. But it has been held inadmissible for such a witness to read to the jury from books, although he concurs in the views expressed, or even to state the contents of such books, though he may refer to them to refresh his memory. . . . And when an expert has given an opinion and cited a treatise as his authority, the book cited may be offered in evidence by the adverse party as impeaching testimony. But unless the book is referred to on cross-examination, it cannot be used for this purpose. It would be a mere evasion of the general rule under discussion, if counsel were allowed on cross-examination to read to the witness portions of such works, and to ask if he concurred in or differed from the opinions there expressed; hence this is not allowed."

This section, no doubt, states the correct rule in regard to the examination in chief and rebuttal, and in regard to the actual reading of

books to the jury in all cases. It also states the correct rule in regard to cross-examination where the specific book has neither been referred to nor has the witness based his opinion upon the *authorities generally,* but, instead, upon his own personal experience, and where his knowledge of and understanding of the authorities, as well as the extent of his general reading, is not a fit subject of inquiry. It does not, however, express either the general or the correct rule in cases where these latter facts exist. The statement is too general. Only four cases, indeed, are cited by Mr. Jones in support of the proposition as made, and none of them bear out the contention of counsel for respondent, nor are applicable to facts such as are to be found in the one at bar. The cases cited are: Marshall v. Brown, 50 Mich. 148, 15 N. W. 55; People v. Millard, 53 Mich. 63, 18 N. W. 562; Bloomington v. Shrock, 110 Ill. 219, 51 Am. Rep. 678; State v. Winter, 72 Iowa, 627, 34 N. W. 475.

The first case, namely, that of Marshall v. Brown, supra, is more or less in point, but a reading of it will, we believe, disclose a quite apparent desire to read the book to the jury, rather than to test the knowledge of the witness. In the case of People v. Millard, 53 Mich. 63, 18 N. W. 562, the point was not merely not a decisive one in the case, but the readings which were under discussion appear to have been had on the *direct examination* of the witness, and their purpose to have been to bolster up his testimony, rather than to test his learning. The language of the opinion is itself a strong argument for the liberal examination of experts and the testing of their knowledge and information. The court, indeed, expressly states that *if the witness is not well read he is not entitled to any credence as an expert,* and yet the case is cited as authority for the proposition that the extent and thoroughness of that reading may not be probed into. The court in its opinion, in fact, merely says: "Another source of error quite as mischievous, and which the court evidently desired to prevent, but did not always do so, was the introduction of what is no more than hearsay evidence, in the shape of references to writers and books in such a way as to invoke their authority. As we have had occasion on more than one record to explain heretofore, expert evidence is only admissible on the theory that the jury cannot be supposed to comprehend the significance of facts shown by other testimony which needs

scientific or peculiar explanation by those who do comprehend it. But this does not permit hearsay testimony of the written or spoken opinions of other persons, whom the jury have no means of examining as to their learning, their honesty, or their sources of special knowledge. Every medical and scientific writer bases much of his conclusions upon what he believes to be true in the reported facts and opinions of other men of science. Those facts may be correctly stated, or they may be assumed on small or no foundation. Those opinions may be taken carelessly at second hand, or they may have been thoroughly weighed before adoption. No one can tell whether a medical book or opinion is reliable or not, until he has applied himself, with some fitting preparation, to its study and criticism. The book may be good in part and bad in part, and neither court nor jury can presumptively ascertain its quality. No one has any title to respect as an expert, or has any right to give an opinion upon the stand, unless as his own opinion; and if he has not given the subject involved such careful and discriminating study as has resulted in the formation of a definite opinion, he has no business to give it. Such an opinion can only be safely formed or expressed by persons who have made the scientific question involved matters of definite and intelligent study, and who have by such application made up their own minds. In doing so, it is their business to resort to such aids of reading and study as they have reason to believe contain the information they need. This will naturally include the literature of the subject. But if they have only taken trouble enough to find, or suppose they find, that certain authors say certain things, without further satisfying themselves how reliable such statements are, their own opinions must be of very moderate value, and, whether correct or incorrect, *cannot be fortified* before a jury by statements of what those authors hold on the subject. The jury are only concerned to know what the witness thinks, and what capacity and judgment he shows to make his opinion worthy of respect. If the opinion of an author could be received at all, it should be from his own words,— not in single passages, but in combination; and this, as has been heretofore held, cannot be done. It is excluded chiefly as both unknown as to value and as hearsay, and an attempt to swear to his doctrine orally would be hearsay still further removed, besides involving the other difficulty of needing interpretation and responsibility. A large

part of this scientific evidence consists of repeated references for support and confirmation to the statements of authors, and, as might be expected, the different witnesses have not always read through the same glasses. To settle their differences the only resort must have been to the very books, which no one claims were admissible. These references were not merely made on cross-examination to test the knowledge and veracity of the witnesses, but *came in as frequently on direct examination.* In Pinney v. Cahill, 48 Mich. 584, 12 N. W. 862, a witness who had asserted that a certain book laid down a certain proposition was allowed to be contradicted by showing it did not. But it is questionable whether the original assertion was properly drawn out, *although when made it was proper to let it be contradicted.* It was distinctly held in Marshall v. Brown, 50 Mich. 148, 15 N. W. 55, that attempts to evade the excluding rule by examining or cross-examining in such a way as to get an opportunity to *get books before the jury* could not be permitted."

In the case of Bloomington v. Shrock, the opinion expressly approves of the case of Connecticut Mut. L. Ins. Co. v. Ellis, to which we have before referred, as an authority in support of the conclusions which we have herein arrived at, and differentiates the case under consideration by the Illinois case, from the case at bar, by the express statement that "in the present case, it has been seen, the course pursued was entirely different. The witness based no opinion which he gave, upon the *authority of books,* and they were only brought in to impair his evidence on cross-examination." In the case of State v. Winter, 72 Iowa, 627, 34 N. W. 475, the question was asked and the book sought to be read on the *direct examination* of the witness, and the authority therefore is in no way applicable here, nor in any way supports the proposition contended for by Mr. Jones.

Indeed, while further treating on the subject of the cross-examination of experts, Mr. Jones himself cites with approval the case of Hutchinson v. State, 19 Neb. 262, 27 N. W. 113, to which we have before referred, and announces a general rule which appears to be clearly in harmony with that opinion and with the present holding of this court. In § 389 (391) of his Commentaries on Evidence, he says: "Not the least important part of the cross-examination is that which sub-

jects the qualification on which the expert has been permitted to testify to a searching inquiry. He has placed himself in the position of one capable, by reason of his superior or peculiar knowledge, of announcing conclusions, which are of weight according to the thoroughness of the knowledge which prompted and is behind them. Therefore it is that the jury is entitled to know more fully the nature of his qualification, the sources of his knowledge, from which he assumes to speak with special authority, and the grounds and reasons upon which his conclusions and opinions are based. For example, a medical witness had stated that his testimony was based upon medical authorities, and he was then asked to state what the medical authorities at the time of the trial held upon the subject. The question was proper. Reese, J., said: 'If the witness had been testifying from his experience and observation from a long course of practice, it was yet proper, for the purpose of ascertaining his means of knowledge by a reference to the teachings of text-books of his profession, and the scientific works from which he had drawn the theories and principles to which he had testified. . . . For the purpose, therefore, of testifying as to his recollection, as well as to his knowledge, it was proper to interrogate him as to the teachings of those authorities; and, in case his testimony was incorrect, to confront him with them, in order that he might be corrected, and the jury thus be rendered able to judge of the weight to which his testimony was entitled. It is insisted that the testimony was inadmissible because "the testimony of the witness shows that his opinion on the point in question was opposed to these same medical authorities." As we have shown, the testimony entered the domain of science, and the grounds upon which the objection is founded appeal most strongly to the mind of the writer as cogent reasons why the cross-examination was proper.' "

For the reasons herein stated, we are now of the opinion that the judgment of the District Court should be reversed, and that a new trial should be had. It is so ordered.