# STATE OF NORTH DAKOTA, Respondent, v. JOHN MUELLER, Appellant.

## (168 N. W. 66.)

**Examination of witness — trial — leading questions — allowing — largely in trial court's discretion — same testimony given by witness for complaining party — no prejudice.**

1. The allowance of leading questions is largely in the control of the trial court, and no prejudice can be assumed where the testimony elicited is afterwards testified to by a witness of the party complaining.

**Homicide — guilt — evidence of strong — insanity — defense of — technical or immaterial errors — disregarded.**

2. Where evidence of guilt of the act of a homicide is overwhelming and practically admitted, and the real defense is that of insanity, mere technical or immaterial errors in relation to the homicide will be disregarded.

**Testimony — errors in excluding — matters later covered by testimony without objection — errors cured.**

3. Errors in the exclusion of testimony will not be considered where the matters in dispute are afterwards testified to without objection.

**Questions — form of — repetition — exclusion of testimony.**

4. It is not error to exclude testimony which has been repeatedly given, even though the question is not exactly in the same form as that which has been before answered.

**Person shooting several others in succession — within short time — murder of first — trial for — res gestæ — all shootings part of.**

5. Where a person shoots several others in succession and within the space of less than an hour and is tried for the murder of the first one shot, all of the shootings are part of the *res gestæ*.

**Questions — previous statements or testimony — impeachment — foundation for.**

6. No error is committed in asking the question, "Didn't you testify in answer to the question I am reading now, and make the following statement when you were at the preliminary examination? etc.;" nor is there any merit in the contention that the evidence on the preliminary examination had been given through an interpreter, and was not understood by the stenographer who transcribed it, when the question is merely asked for the purpose of laying the foundation for impeachment.

**Witness — medical expert — questions as to family history — crime — criminal tendencies.**

7. No reversible error was committed where a medical expert was asked whether a family history of crime would not generally result in a descendant being in the penitentiary, and where the expert answered that "criminal tendencies are not inherited," and even though there was no proof of any such family history.

**Cross-examination — ill feeling — prejudice of witness — may be shown on.**

8. The ill feeling and prejudice of a witness can always be shown on cross-examination.

**Hypothetical question — refusal to allow — freedom of examination — allowed later.**

9. The mere refusal to allow a hypothetical question will not constitute reversible error, where later on in the trial the utmost freedom of examination is allowed.

**Witness called in rebuttal — name not indorsed on information — may testify.**

10. It is not necessary that the name of a witness who is called in rebuttal should have been written upon the information.

**Preliminary hearing — testimony given on — stenographer taking — may testify to what he heard.**

11. When a stenographer testified as to what he heard upon a preliminary trial, and not as to the contents of his notes, and there is no evidence that he did not understand the German language, no error is committed in allowing him to testify even though the evidence shows that the testimony on the preliminary examination was given through an interpreter, and even though the stenographer had not testified that he had correctly transcribed his notes.

**Jury — instructions — murder — first degree — what constitutes — premeditation — malice — wilful intention — reflection — determination.**

12. It is not error to instruct a jury that "in order to constitute murder in the first degree as charged in the information the killing must have been wilful, with malice aforethought, and with premeditation and deliberation. There must have been a specific, deliberate, premeditated intention to take life, unaccompanied by any circumstance of mitigation. The generally accepted meaning of the word 'premeditation' is a prior determination to do the act in question and then determination to do it, but it is not essential that this intention should exist for any considerable period of time before it was carried out. If the determination is formed deliberately and upon due reflection, it makes no difference how soon the fatal resolve was carried into execution. An act is done wilfully when done intentionally and on purpose.

"Murder in the second degree differs from murder in the first degree only in the fact that as to the second degree there is no premeditation or deliberation.

Thus, where a person forms a design to kill in the midst of a conflict and immediately executes such design, the killing is not premeditated, and is therefore no higher offense than murder in the second degree."

Opinion filed May 9, 1918. Rehearing denied June 10, 1918.

Prosecution for the crime of murder.

Appeal from the District Court of Stutsman County, Honorable *J. A. Coffey,* Judge.

Judgment for plaintiff. Defendant appeals.

Affirmed.

*Knauf & Knauf* and *John Carmody,* for appellant.

Where an expert hears the testimony of the witness, and the testimony is undisputed, as it was in this case, it is proper for him to base his opinion on that testimony. Walters v. Rock, 18 N. D. 45, 115 N. W. 511.

A witness should not be cross-examined upon matters upon which he was not interrogated upon his direct examination. State v. Cross, 26 N. W. 62.

"One who did not understand the words spoken by a witness, but who heard the interpretation thereof, cannot prove what the interpreter said, where no reason is shown why the interpreter is not produced." Schearer v. Harber, 36 Ind. 536.

"The testimony given through an interpreter cannot be proved on a subsequent trial by reading the shorthand notes of the evidence as it was given by the interpreter." People v. Ah Yute, 56 Cal. 119; People v. Les Fat, 54 Cal. 527.

"Proper foundation must be laid before introducing the minutes of the court as evidence of testimony in former proceeding." Watkins v. Clowe, 119 App. Div. 527, 103 N. Y. Supp. 270.

On a trial for murder in the first degree it is the duty of the court to fully and properly instruct the jury as to what constitutes murder in the second degree. Failure to do so is reversible error. State v. Marsh, 171 Mo. 523, 71 S. W. 1003; State v. Curtis, 70 Mo. 594; State v. Hunter, 92 N. W. 872; People v. Balkwell, 143 Cal. 259, 76 Pac. 1017; Maugher v. State, 23 So. 26; Sullivan v. State, 15 So.

264; Comp. Laws 1913, § 10,822; Moline Plow Co. v. Gilbert, 3 Dak. 392, 1 N. W.

The functions of the court and those of the jury are limited and are separate and distinct. The court must only instruct as to the law of the case, and the jury are the sole judges of all questions of fact. Territory v. O'Hare, 1 N. D. 30, 44 N. W. 1003; State v. Barry, 11 N. D. 428, 92 N. W. 809; State v. Peltier, 21 N. D. 188, 129 N. W. 451.

Opprobrious words of conduct used with reference to the wife of a person usually tend to excite in him the fiercest passions, and are a sufficient provocation to mitigate a killing, from murder to manslaughter.

The means by which the passions of a person are excited are regarded as immaterial, so long as they are of a nature naturally calculated to have such effect. Note C. 4 L.R.A.(N.S.) 158 and cases cited; State v. Grugin, 147 Mo. 39, 42 L.R.A. 774, 71 Am. St. Rep. 553; Scott v. Com. 17 Ky. L. Rep. 308, 29 S. W. 141; Massie v. Com. 16 Ky. L. Rep. 790, 29 S. W. 871; Reg. v. Rothwell, 12 Cox, C. C. 145; Seals v. State, 3 Baxt. 466.

The court should have instructed that if the killing was wilful and unlawful, but done without deliberation or premeditation, the offense would be murder in the second degree. State v. Noah, 20 N. D. 281; 21 Cyc. 1063, and cases cited.

*John W. Carr,* State's Attorney, *Lewis Tellner,* Assistant State's Attorney, and *William Langer,* Attorney General, for respondent.

The authorities cited by counsel for appellant do not support their assignments of error. Evidence offered which assumes the existence of a fact essential to a conviction, where there is no evidence that such fact existed, is of course inadmissible. Such is the only vital point presented by counsel, but no such condition existed in this case. Clock v. State, 19 N. W. 543.

The trial court was correct in charging that murder in the second degree differs from murder in the first degree only in the fact that as to the second degree there is no premeditation or deliberation. State v. Noah, 20 N. D. 281.

BRUCE, Ch. J. The defendant in this case was convicted of the crime of murder in the second degree. Practically the only defense is that of insanity. The abstract contains nearly six hundred printed pages. Appellant's brief contains seventy-three assignments of error, and the rules of this court are entirely ignored which require "the assignments upon which he relies to be set forth," and that "the brief shall contain such portions of the record as will enable the court to clearly understand the nature of the case, and, where rulings on the testimony constitute the errors complained of, sufficient explanatory facts or evidence shall be recited." See rule 34.

These omissions are no doubt due to the fact that the principal counsel has been called to the service of his country, and are ignored by this court for that reason, and for the reason that it does not desire that anyone shall be imprisoned for thirty years without a full opportunity for a hearing. Defendant's omissions, however, have rendered an examination of the case extremely laborious and extremely difficult.

The defendant, John Mueller, is charged in the information with the murder of Valentine, otherwise Fulda Hins, on December 25, 1915. Valentine was seventeen years of age and the defendant was twenty years old. The defendant lived with his parents, 6 miles north of Medina, in Stutsman county, and Valentine Hins lived with his parents 4 miles north of Medina. The Hins family had lived there about five years, at the time the crime was committed. The Hins and Mueller families appear to have been friendly and visited back and forth until January, 1915, when they became unfriendly because of undue intimacy between Gustave Hins, a brother of the murdered boy, Valentine, and Anna Mueller, a sister of the defendant, John Mueller. Some time about January 9, 1915, Gustave Hins, having been charged by the Mueller family with this offense against Anna Mueller ran away and left the country. From that time until the time of the murder, on December 25, 1915, the two families did not visit back and forth and were not very friendly. The defendant, John Mueller, had not been to the Hins home for a year prior to the evening of December 24, 1915, the night before the murder was committed.

The defendant went to the Hins home on the afternoon of December 25, 1915, and together with Valentine Hins and Frederick Hins, the father of Valentine, went to the barn on the Hins farm to do their

chores. Valentine Hins and the defendant, John Mueller, went into the barn. Frederick Hins, the father of Valentine Hins, was working outside trying to drive some colts into the barn. When he got close to the barn he noticed that someone had shut the door which he had opened a short time before. When he opened the door the defendant, John Mueller, began shooting with a revolver. Frederick Hins describes what happened, as follows: "Somebody had closed the door, but I don't know who it was. It was not me. I then got behind the colt to drive it into the barn. Mueller was standing behind the horse which Fulda had watered last. I did not see Fulda. . . . I wanted to drive the colt back to its place. I got about 8 feet from where Mueller was. It was John Mueller, the defendant. I did not see any gun from where he shot me. He shot me, then I saw it. When he shot me he was standing there until I came up and until he shot me. Was so scared I don't know where he shot me first or where the shot hit me first. After he shot me, he shot me immediately again. The second time he hit me up here. I noticed he struck me up here. I did not say anything. I turned around and ran out, and he shot me again. He shot me through the foot, I mean he hit me through the leg instead of the foot. In the barn he shot me three times. After I was hit the third time, I fell down. I did not quite fall down altogether, but almost fell down or collapsed. I got out of the barn. My wife came running. She was feeding the pigs in the old barn. I did not see anything else besides my wife when I got out. I did not see Mueller after I got out. I did not see Mueller until my wife was shot dead. I mean she fell down before me and was completely dead. She did not die. She got up again after a while. When I saw my wife shot down like she was dead, I saw Mueller. He was standing beside me. . He was standing quiet and looking. He did not point the gun at me right away. My wife got back upon her feet. She was holding my arm when she was shot. He came up behind and shot her and she fell down before me. She was shot in the neck. After she got up she said, 'John, are you shooting on purpose, or what is the matter?' John said, 'Yes.' He said, 'We had this made up three months ago already that this was to happen to you.' He did not say anything else. . . . My wife said you were with us last evening and we thought you were good. He said, 'Well, we are Muellers.'

My little daughter came out and got hold of me and said, 'Oh, God! Father is shot.' Mueller put the revolver up to her breast and said, 'Get away or I will shoot you.' Then he put the revolver up to the breast of my wife and said, 'Go away or he would shoot her.' And then he pointed the revolver at me and said I should go away or he would shoot. I said, 'John, have pity on me and do not kill me altogether.' Then my wife said I should come along. Then I went in. Up to this time I had not seen Fulda."

The witness then details going to the house and their son Valentine, or Fulda as they sometimes called him, coming to the house in a wounded condition, and details an attempt made by the defendant, John Mueller, to get into the house, and how they refused to let him come in until he had put down his revolver. Prior to the shooting of Frederick Hins and his wife, the defendant and Fulda Hins were in the barn with the door shut, and Fulda, or Valentine, was shot while in the barn. After the defendant had laid down his gun the Hins let him into the house. Mr. Hins, the father, said to the defendant: "John are you drunk or what is the matter with you?" And the defendant replied, "I am as sober as you." And it appears from the testimony that the reason given by the defendant for shooting was that he wanted to marry Johanna Hins, daughter of Frederick Hins, and that he "could not get her." These same statements are testified to by Mrs. Hins a little later on in the abstract. The witness Frederika Hins, mother of Valentine Hins, details what happened in almost the same language. She says that she heard Frederick Hins ask the defendant, John Mueller, "Are you drunk, or what is the matter with you that you shoot all of us?" And the defendant replied, "I am as sober as you." The witness says she said to John Mueller, the defendant, "You were with us last night and I thought you were favorably inclined towards us." He said, "Well, we are Muellers." She asked him if he was shooting on purpose, and he said, "Yes, we decided three months ago that we were going to do this to you."

This same witness describes what happened after the shooting, as follows: "I next saw John after he and Valentine came up to the house. I was inside the house then. The first thing that called my attention to their coming up was Fulda saying quietly, 'Mother, open

the door.' Frederick said, 'Is John Mueller there too?' Fulda said, 'Yes.' I said, 'Then we will not open because he will shoot us again.' John said we should open up or he would shoot through the door." Then the witness details how the defendant finally put down his re- volver and came up to the door and was let in. She also describes how Valentine Hins, or Fulda as he was called, looked when he came into the house. She says: · "When he came in I noticed that Fulda's head looked as though someone had poured a pailful of blood over him. The blood was running down and was all run down from the top of the head." The witness continues as follows: "After John laid the gun on the cellar door and I let him in the house, he came in and went up to Frederick and said, 'Forgive me, uncle! forgive me, uncle!' Frederick said, 'John, do you think I could forgive you! Look at me! You put three bullets into me and shot my wife and Fulda!' John said, 'If I hadn't done it yet, I would give a million dollars.' Then I went out and took the revolver and stuck it into the ashes. . . . After I buried it in the ashes the people came and I brought it in and laid it on the table." The witness then stated that the defendant gave his reason for the shooting, as follows: "I said, 'I don't know why,' he said, 'I tried to get Johanna and I saw I can't get her and that is why I shot.' "

The defendant then took one of the Hins horses and rode to his home. After he reached there he told what had happened at the Hins home. He claims that he has no recollection of the shooting at the Hins home. He, however, admits remembering everything that hap- pened that evening except the actual shooting.

He remembers hearing Ida Hins say to her father, "Are you shot? Are you shot?" He remembers that he had the gun in his hands. He admits remembering that he threw it away. He admits remembering that he rode home on Hins's horse. He says he discovered that while on the way to his home, although he pretends not to be able to remem- ber what he told his brother, or father or mother, when he got home.

That the defendant knew what he had done and had told his father and mother about the shooting when he reached home is also very clear. The Muellers immediately went to the Hins's home, and upon reaching there informed the Hins of what the defendant had told them, and the evidence clearly shows that Mr. and Mrs. Mueller

learned of the shooting before they got to the Hins home. Upon reaching the Hins home, Mrs. Mueller, mother of the defendant, told Mr. Hins and Mrs. Hins that the defendant had said that he "had accidentally shot Fulda."

Mrs. Mueller, the mother of the defendant, says that she was in the room when John came home that night, and "I went out when I heard there was something happened. We always asked him (defendant), 'How did you shoot and where did you shoot them?' We were talking about that on our farm before they were hitching up the horses. My husband had told me that John had said to him that Hins had said to him he had shot." Again, in answer to the question:

"But your husband, Christ, had told you that John had told him that he had shot over at Hins?" She answered, "Yes."

It also appears from the testimony of the defendant's father that the defendant had told him all about the shooting after he had reached the Mueller home.

The testimony also shows very clearly that during the period of the shooting the defendant, John Mueller, had reloaded, or partly reloaded, his revolver. The revolver with which he did the shooting was a gun with five chambers, or a five-shot revolver. When the revolver was found after the shooting, four of the chambers were empty and one contained a loaded cartridge, but the testimony shows that there were at least five shots fired. Mr. Hins had been shot three times, Mrs. Hins had been shot once, and Valentine Hins at least once.

The testimony of Frederick Hins shows that the barn door had been closed by the defendant just prior to the shooting. Fulda or Valentine Hins was in the barn and was shot while the door was closed. When Frederick Hins went up to the barn and opened the door, John Mueller, the defendant, immediately shot him three times. The testimony would indicate that the murder committed by the defendant was contemplated and planned before the act was performed.

The defendant's only real defense, therefore, is that he was insane, when he committed the act, or, in other words, that he had an epileptic fit. The defendant's father and mother and some other members of the family attempt to show that he had suffered injuries to his head and was subject to fits when anything angered him for about four years prior to the time of the shooting. There is, however, nothing

in the testimony showing that any of the friends or neighbors of the Muellers had ever heard of the fits. The defendant was confined in the Stutsman county jail from December 25, 1915, until the time of this trial in July, 1916, under such circumstances as to be constantly reminded of all of the circumstances connected with this entire matter, but the evidence does not show that he had any fits during that time. The defendant's father and mother attempt to show that, whenever anything was said regarding the trouble between Gustave Hins and Anna Mueller, the defendant, John Mueller, would immediately become angry and have a fit. The trial of this case in district court occupied several days time, and, although this same matter was constantly referred to, and the defendant was continuously in court, there is no evidence of his having had any fit on this occasion. The mother of the defendant also says that the first person she ever told that her son, John Mueller, had fits, was his counsel in the case.

There is, in short, no dispute about the fact of the shooting of Mr. Hins, Mrs. Hins, or Valentine Hins, by the defendant. Neither can there be much dispute that the defendant's acts constitute a clear case of murder.

The defendant's sole claim is that he had a fit, caused by some language used in the barn by Valentine Hins, and that he did not know what he was doing when he shot. He remembers practically every detail of the occurrences happening upon this day up to the moment that he claims this remark to have been made. He does not claim that he was not fully responsible for his actions up to that time. His explanation of how he happened to have his revolver with him on that day is very unsatisfactory. He claims to have carried it in his overcoat pocket, and he says that he did not take his overcoat to the barn, but he offers no explanation of how the revolver got from his overcoat pocket into the pocket of his inside coat. He makes no explanation of the closing of the barn door prior to the shooting of Valentine Hins.

The first error complained of is the overruling of defendant's objection to the question, "Did he say anything about being at Muellers?" This was objected to as being leading, and it is claimed that it was asked for the purpose of proving that the Hins and the Muellers were enemies, and that there was a tribal feud between them. This

fact, however, was later testified to by Mrs. Hins without objection on the part of the defendant, and we can see no prejudice even if the question was otherwise objectionable, of which we have some doubt. Even if the question was leading its allowance was within the discretion of the trial court, and all that the testimony would tend to show would be a family feud and a state of mind that would tend to prove a criminal intent, and of this intent there can be no dispute, if only the defendant were sane and capable of entertaining it.

Counsel next complains of the question, "And was that the same son that was hurt in the head on the 25th of December on your farm at or near your barn?" There is no doubt of the rule relied upon by counsel for defendant, that a question which assumes the existence of a fact essential to a conviction where there was no evidence that fact existed is entirely inadmissible. The record, however, elsewhere shows that the son referred to had been hurt, and the rule is not here applicable.

Objection is next made to the allowance of testimony as to blood being upon one of the colts, and that the same was entirely well before John went into the barn. It is claimed that the questions assumed facts not in evidence, and have no bearing upon the issue in the case. We cannot see, however, that any reversible error was committed. The matter had no bearing upon the sanity or insanity of the defendant, and that we consider to be the only question in issue.

The evidence indeed is so overwhelming as to the guilt of the defendant, John Mueller, that he intentionally killed the deceased, and that the same was done with a criminal intent, and that the act would constitute murder, unless perchance the defendant was insane, that it is really immaterial that any technical errors were committed. For this reason we also deem the alleged errors assigned on the ground of refusing to strike out testimony as not being responsive, to have been harmless even if errors were committed. Next follows several alleged errors in the admission of testimony. This testimony, however, was elsewhere given without objection and had little, if any, bearing upon the question of insanity. Error is next assigned on the refusal to allow the witness Fred Hins to answer the question, "If you said that to Mrs. Mueller you don't remember it now, Is that right?"

The witness had, however, already denied making the statement, and no material error was committed. The first three errors complained of under assignment No. 8 are not worthy of notice. As to the fourth, which is that the court erred in not allowing the witness Fred Hins to answer the question: "Did you tell Louie that at the time he was talking to you at the hospital that when John had the revolver at the time he shot you and Reca out at the barn that he looked terrible, and that he acted just like a mad dog and frothed at the mouth, or words to that effect," the objection was that this fact had been denied several times, and the testimony would be a repetition and an improper subject on cross-examination. The complaint of the appellant is merely that the question had not been before asked in the same form. There is, of course no merit to the objection.

The next assignment of error is entirely without merit. All that the testimony would have shown would have been the point at which the bullet came out of the witness's back. This had nothing to do with the question of sanity or insanity. As we have said before, the question of the killing and the intentional killing is so well established that the technical errors on this point are immaterial. The same is true of the claimed error in regard to the admission of testimony as to the shooting of Mrs. Hins and as well as of the deceased. All of the shootings, too, seem to have been part of the *res gestæ*.

For the reasons before assigned and for the reason that insanity was practically the only defense, assignment No. 11 is entirely without merit.

The leading question complained of in assignment No. 12 could have had no prejudice.

The question complained of in assignment No. 13 was not even answered, and counsel asks a good deal of us when he asks us to infer that "the probability is, however, that the witness nodded her head." There is no such presumption that we know of in the law.

There is absolutely no merit in assignments Nos. 14 and 15, and they are not worth discussing, as the points were fully covered later in the testimony.

Assignment No. 16 relates to the testimony as to the condition of the wounds on the witnesses Mr. and Mrs. Hins. Whether this testimony was competent and relevant or not is immaterial here. If any-

thing, the debauchery of bloodshed would indicate an unbalanced mind; and, as that was practically the only defense, the testimony, even if irrelevant, was without prejudice.

Assignment of error No. 17 is too indefinite and incoherent to admit of consideration.

Assignments of error Nos. 18, 19, 20, 21, and 22 relate to the testimony in regard to the wounds on Mr. and Mrs. Hins, and for reasons given before do not furnish any grounds for a reversal.

Assignment of error No. 23 is absolutely without merit, and so much so that it needs no discussion.

The exception which is the basis of assignment of error No. 24 relates to questions which were clearly leading and to testimony which could easily have been produced in proper form as far as the exclusion was concerned, or to testimony in relation to matters which could have had no effect upon the verdict.

There was certainly no prejudice in the errors complained of in assignments Nos. 31, 32, 33, as the questions objected to were afterwards answered. There is certainly no merit to the objection that the witness Christ Mueller was allowed to answer whether he had a bad temper, and that this was immaterial.

In assignment of error 34 complaint is made of the overruling of defendant's objection to questions asked witness Christ Mueller, and to the proceedings on cross-examination. The witness Christ Mueller had been a witness at the preliminary examination. His testimony was given through an interpreter and taken down in shorthand by H. E. Rutgers and was transcribed by him. The attorney for the state was examining the witness on the transcript for the purpose of impeachment, and asked questions in the following form:

"Didn't you testify in answer to the questions I'm reading you now, and make the following statements when you were at the preliminary examination? First, I asked you, 'What did John do when he came home?' and did you answer, 'He didn't do anything?'" The objection was as follows:

"Objected to on the ground that it is not the best evidence. The deposition or testimony itself being the best evidence and on further ground being the conclusion of the witness."

Counsel for defendant claims that these questions were not proper

for impeachment purposes. He states that the evidence on the preliminary examination had been given through an interpreter and was not understood by the stenographer who transcribed it. He claims that there was no evidence before the court that the evidence of the witness Mueller was correctly interpreted and correctly taken down and transcribed.

There is certainly no merit in these objections. Counsel was merely seeking to lay the foundation for impeachment. He was not introducing the transcript in evidence, nor was anyone testifying therefrom.

Assignment of error No. 25 is based upon the court's action in allowing a witness, after he had testified that the defendant's face was first white and then turned reddish or purple, to answer the question, "A man does that when he gets mad, don't he?" The mere statement of the assignment shows its lack of merit.

In assignment of error No. 36, exception is taken as to the exclusion of testimony given by the specialist, which was not in fact excluded and was later fully covered.

The same is true of assignment No. 37 and assignment No. 38.

In assignment No. 39, objection is made to the following questions asked a medical expert on cross-examination.

Q. Supposing the Muellers's testimony as untrue, and that it is all wiped out of this case, then there wasn't anything this young man did but what might have been normal?

A. If you are going to wipe out the fits and epilepsy.

Q. Going to wipe out the fits. Wipe out the fits and epilepsy, my defense falls.

Q. I am talking about the defendant's defense the wiping out the fits at the binder, and at the elevator in Medina, and anywhere; suppose that evidence didn't exist, then he didn't do anything besides that, that might not have been normal?

A. Might have been normal.

Q. So you have got to have the fits in order to make this defense of epilepsy good?

A. The fits and corroborative facts. Not without the corroborative physical condition of this man, which is as important as his epilepsy.

Q. Now, I want to know something else. What is the mental classification of these fellows that are in the fit, that have a predisposition or tendency to crime?

That is too big a question. It is a very large question. That depends on their family history and conditions and their bringing up.

Q. If they had a family history of crimes and criminal tendencies?

A. You are getting into deep water now.

Q. I expect you to be fair with me, because I am not skilled in this line. If they had a family history of crimes, and the grandfather had been a drunkard and epilepsy ran in the blood; and they had criminal tendencies, bank robbers, shooters, or what nots; and these descendants of such a race, when you come on down with them, you would find those fellows in the pen, wouldn't you?

Mr. Knauf: Objected to as improper cross-examination assuming a state of facts not in the evidence, and not before the court; calling for extraneous matters not referred to in the examination.

The Court: Overruled. Exception.

A. Criminal tendencies are not inherited. The social conditions, surroundings, environment, education, and bringing up and such matters, are the things that made criminals, not inheritance. If this man didn't have good bringing up, if he had fights with his father and brothers, and his environment not the best, it perhaps might be a tendency to make him have a criminal mind. I wouldn't say that he was a criminal defective. You might find a defective. Defectives might commit crimes, mental defectives. A defective physically and you might say morally, I don't know whether that is the proper term, is a man who doesn't have the normal sense or moral responsibility. He is defective in that he doesn't have the normal sense of moral influence or actions, upon himself. That is what makes a natural criminal.

Objection is also made to the question, "Did you ever see a criminal who had an expressionless face?"

All of these questions were asked on cross-examination. The doctor had testified fully as to the appearance of the defendant, the condition of his skull, and had been examined in regard to his history and that of his antecedents. Certainly no harm was done by asking him if he had ever seen a criminal who had an expressionless face, as he answered, "Yes." It is true that counsel should not have asked him the

40 N. D.—4.

question, "If they had a family history of crimes and the grandfather had been a drunkard and epilepsy ran in the blood; and they had criminal tendencies, bank robbers, shooters, or what nots; and these descendants of such a race, when you come on down with them, you would find those fellows in the pen, wouldn't you?" We hardly believe, however, that in the mass of evidence that is before us this mere question would have stood out and prejudiced the jury against the defendant, especially as the doctor answered that criminal tendencies were not inherited.

Assignment of error objects to the question, "You all get mad out there on the farm sometimes, don't you?" · It was claimed that the question had no bearing on the case at bar. It probably had not, but it could hardly have been any more prejudicial than if the witness had been asked if he, like all other men, was not a miserable sinner.

Assignment of error 43 refers to the testimony of Katie Kassman. The witness testified that the defendant was hanging with his toes on the rafters; that she pushed him from behind, and he fell down on his head and laid on his face. She did not know how long, as she had no watch. She was then asked the question, "Do you know whether he got unconscious at that time?" An objection to the question was sustained. It is claimed that this was a preliminary question and could have been answered by yes or no, and that the objection came too soon; that neither the court nor the state could tell at that time whether the testimony defendant was attempting to elicit from this witness was proper or improper, hence the question should have been answered.

We can hardly, however, see any prejudice in this matter. After the objection the witness testified that John Mueller lay on the floor about ten minutes as far as she knew, that she didn't know what he was doing while he was lying there, that she didn't know whether he bled in his face or ears or eyes at that time. She also later testified that, after she pushed John down, she went out because she felt sorry, and stayed out about seven minutes.

We have no reason to believe that she would have known whether he became unconscious or not, or whether his unconsciousness would have had any effect on his sanity or on his later physical condition.

Assignments 44, 45, and 46 relate to questions which tend to show

ill feeling between the witness Froelich and Mr. and Mrs. Hins. Objection is made that these matters were not referred to on the direct examination. The objection, of course, is not well taken, as ill feeling and prejudice can always be shown.

As far as the assignment of error number 47 is concerned it is clear to us that no prejudice is shown. The evidence may have been more or less hearsay, but was entirely harmless.

Though, too, it is claimed that the witness Louie Froelich was allowed to testify as to conversations held with the mother about the conduct of Anna, these conversations had been gone into on direct examination and the matter was unimportant.

Assignments of error No. 48 and 57 relate to the examination of the medical expert, Dr. Culbert. Dr. Culbert was an expert on insanity as well as on epilepsy. He was in the court room and heard all of the testimony of the Muellers in regard to the alleged epileptic spells of their son John. He was then asked:

Now, Doctor, assuming that their statements in that regard were true, and that thereafter and during the time that the boy had become unconscious and that thereafter he didn't remember what he had done, what in your opinion was the boy suffering from at that time?

Ans. Mental or psychic form of epilepsy. I have also heard their statements as to the time in January, 1915, when the talk had been about his sister Anna and Gustave Hins and the baby. I heard the description of his actions, and how he stiffened out and became rigid, and how he started to fall and they had taken him up and put him to bed. In my opinion he was suffering from epilepsy.

Mr. Thorp. (Preliminary for an objection.)

Q. Are you basing your answer upon the hypothesis as stated by Mr. Knauf, or by what you heard testified to by the defendant's witnesses?

Ans. The hypothesis stated by Mr. Knauf.

Mr. Thorp. Then we offer the objection on the ground and for the reason that there are two opinions called for by this witness,—the conclusion as to what the effect of the testimony of defendant's witness

was, and what their statements were as to how they put him to bed and as to how he fell down?

The witness must draw his conclusion as to what they stated and what their statements meant. Secondly, that the question calls for an answer and an opinion based upon the opinion and conclusion, and there being no proper hypothetical question and it inveighs the province of the jury and puts it up to this witness to decide for himself what the witness meant by this statement.

The court sustained the objection and defendant excepted.

Counsel admits that the court did not strike out the testimony and it may have been considered by the jury, but he claims, however, that the objection prevented the defendant from properly and thoroughly cross-examining the witness. Whether technical error, however, was committed or not we are not called upon to decide. It is sufficient to say that not only was the answer not stricken out, but defendant's counsel was afterwards allowed the utmost freedom in examining the witness, and we are satisfied that everything that was material was elicited from him.

Objections are next made to the rulings of the court on several questions. No reason, however, for the objections, is pointed out, no prejudice is shown, and we are unable to find any. Assignment of error No. 55 relates to objections made by the defendant's attorney to questions which were asked Dr. Culbert on cross-examination, one of them being, "Did you ever know of a cold blooded murder to be committed by a man that was sane?" Counsel states that he cannot understand the bearing of these questions. Nor can we. It would seem, however, that if they tended to do anything it was to aid and not to injure the defendant. They were asked by the state's attorney, and the answers, even if they were suggested, would tend to sustain the defendant's contentions. Many of the objections, indeed, are trifling, and there are so many of them that their number occasions us to lose faith in them all. An objection for instance is made to the question, "What do you mean by epilepsy?" What harm could come from this question, we are unable to see.

Assignments of error Nos. 58, 59, 60, and 61 relate to the cross-examination of a medical expert, and the complaint is that facts not

in evidence were assumed. The questions, however, came, we believe, under the general rule that where a medical expert bases his opinion upon his knowledge and what he has read, you can go at great length into his training and experience and the extent of his readings. See State v. Brunette, 28 N. D. 539, 150 N. W. 271, Ann. Cas. 1916E, 340.

Not only was the testimony complained of in assignments of error Nos. 62 and 63 stricken out by the court, but the objection here made, that it was negative in its form, was not made in the court below. The principal objection, indeed, was that the name of the witness was not written upon the information, and this, of course, was without merit, as the witness was called in rebuttal.

Assignment of error No. 64 is based upon the fact that a court reporter, Henry Rittgers, was allowed to testify to certain testimony given at a preliminary hearing and for the purpose of impeaching the witness Christ Mueller. The objection is that the testimony of the witness in the justice court was given through an interpreter, and counsel argues that the interpreter was not called to testify, and the reporter did not understand the German language. This fact, however, is not apparent from the record, and whether the stenographer understood German or not, we are unable to determine. All that the record discloses is that he testified from "his memory of the memorandum which he made at that time and from his memory of the testimony which he heard."

Nor is there any merit in the contention that the witness did not testify that he had correctly transcribed his notes. The witness testified as to what he had heard, and not to the contents of the notes.

It is next urged that the court failed to instruct the jury as to what constitutes murder in the first degree, and also as to what constituted murder in the second degree; also that in his instructions the court assumed that the defendant fired the shot that penetrated the head of the deceased. The court, however, did instruct the jury as follows:

"In order to constitute murder in the first degree as charged in the information, the killing must have been wilful, with malice aforethought, and with premeditation and deliberation. There must have been a specific, deliberate, premeditated intention to take life, unaccompanied by any circumstance of mitigation. The generally accept-

ed meaning of the word 'premeditation' is a prior determination to do the act in question and then determination to do it, but it is not essential that this intention should exist for any considerable period of time before it was carried out. If the determination is formed deliberately and upon due reflection it makes no difference how soon the fatal resolve was carried into execution. An act is done wilfully when done intentionally and on purpose."

"Murder in the second degree differs from murder in the first degree only in the fact that as to the second degree there is no premeditation or deliberation. Thus, where a person forms a design to kill in the midst of a conflict and immediately executes such design, the killing is not premeditated, and is therefore no higher offense than murder in the second degree."

These instructions we believe to have been sufficient under the holding in State v. Noah, 20 N. D. 281, 124 N. W. 1121, since the record also discloses the fact that the court by repeated instructions submitted to the jury the question as to whether the defendant fired the shot claimed to have killed Valentine Hins. In fact, the contrary seems hardly to have been contended for by defendant.

Counsel also claims that the court should have instructed the jury to the effect that, in order to convict the defendant of murder in the second degree, a jury must find from the evidence beyond a reasonable doubt that the defendant did unlawfully, premeditatedly, and with deliberation kill the said Valentine Hins. No premeditation or malice aforethought, however, seems to be necessary to constitute this crime. Murder in the second degree is defined by §§ 9462 and 9469 of the Compiled Laws 1913. The statutes upon the subject are as follows:

"Homicide is murder in the following cases:

"1. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed or of any other human being.

"2. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"3. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

"Every murder perpetrated by means of poison, or by lying in wait, or by torture, or by other wilful, deliberate or premeditated killing, or in committing or attempting to commit any sodomy, rape, mayhem, arson, robbery or burglary, shall be deemed murder in the first degree; all other kinds of murder shall be deemed murder in the second degree."

We are satisfied that no material errors were committed on the trial, and that the jury was fully and fairly instructed not merely on the law relating to murder in the first and second degrees, but on the defense of insanity, and that this latter defense was in reality the only one which was interposed. We are fully satisfied with the verdict of the jury.

The judgment of the District Court is therefore affirmed.

ROBINSON, J. (concurring). In this case defendant was convicted of murder in the second degree and sentenced to imprisonment for thirty years. He appeals on the ground that at the time of committing the deed he was insane. There is no doubt defendant was guilty of a cruel and unprovoked shooting and killing. He was twenty years old. and for years he and his parents had lived on a farm in Stutsman county, a few miles from the Hinses, a German family. The two families visited together and became rather intimate, and Gustave Hins, a young man, became too intimate with a sister of defendant, and instead of marrying her he went to Canada. The result was an ill feeling between the two families. To wipe out the disgrace to his sister defendant concluded to make a general killing of the Hins family.

Accordingly on the afternoon of December 25, 1915, he took his five shooter and went to the Hins place, shot the old man three times, the mother once, and then fatally shot the young man Valentine Hins. Then he reloaded his five shooter and tried to get into the house, but they parleyed with him and held him out till he put down his revolver. The father said to him: "John, are you drunk or what is the matter with you?" The answer was: "I am as sober as you." To other questions he answered: "Well, we are Muellers. Yes, we decided three months ago that we were going to do this to you." ...

When let into the house he relented and asked forgiveness for the shooting and said he would give a million dollars if he had not done it. Defendant took one of the Hins's horses, rode to his home, told what he had done, and then the Muellers at once hitched up and drove to the Hins place.

There was a showing that defendant had suffered injuries to his head, and that he was subject to fits and to extremes of uncontrollable passion. Still the friends and neighbors do not remember of his having fits, and he had no fits during a period of eight months that he was in jail before the trial.

It may well be conceded that defendant was not in a proper and normal condition at and prior to the time of the shooting, and that it is his misfortune as well as his fault if he is subject to uncontrollable passion which throws him into fits and impels him to commit crime. However, he may well be thankful that he does not have to hang by the neck for so grave a crime, and that our state's prison is in reality a reformatory where by good conduct he may learn to think and control his passions and reduce the term of his sentence to twenty years.

Certain it is defendant has shown himself to be a very unsafe member of society. He has had a fair trial. The question of his insanity has been fairly submitted to the jury and they have found against him. There is no occasion for this court to repeat or to argue the convincing testimony; but even if there were any doubts, which there is not, a court should hesitate long before releasing one who has shown himself to be a very dangerous person and wholly unworthy of civil liberty. Judgment affirmed.