JOSEFA COLÓN, ETC., Plaintiff and Appellant, v. SUCCESSION OF ALBERTO J. TRISTANI, ETC., Defendant and Appellee.

No. 5659. Argued January 14, 1933.—Decided June 9, 1933.

(see 44 P.R.R. 163).

R. Atiles Moreu and Erasto Arjona Siaca for appellant. José A. Poventud and Alberto S. Poventud for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the Court.

The defendant has applied for a reconsideration of our judgment.[*] It is urged in the first place that we committed

[*] NOTE: See 44 P.R.R. 163.

error in holding as competent and in considering the testimony of Josefa Colón, mother of Alberto Colón, with regard to transactions, acts, and statements of Alberto J. Tristani, putative father of said minor.

The defendant through its learned counsel maintains that the Legislature of Puerto Rico, on March 10, 1904, removed, similarly as had been done in other jurisdictions, the causes of incapacity to testify by reason of interest in a trial or proceeding, but that at the same time it established a prohibition against the parties to testify with regard to statements or transactions with a deceased in actions against his heirs, unless called to testify by the opposite party, thus decreeing the subsistence of this last case of incapacity in conjunction with the provision abolishing the disqualification on the ground of interest. The legislative provision to which the defendant refers is included in the Act to define who are competent witnesses, and to repeal section 1215 of the Civil Code, approved in 1904, the third section of which reads as follows:

"In actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party; and the provisions of this section shall extend to and include all actions by or against the heirs or legal representatives of a decedent arising out of any transaction with such decedent."

The defendant argues that in accordance with the section above quoted, the testimony of Josefa Colón should not have been admitted, and in support of her contention she quotes from the opinion delivered in the case of *Morales* v. *Heirs of Cerame,* 30 P.R.R. 784, the last paragraph of which we are transcribing in its entirety, inasmuch as the part she omitted has some relevancy in this case, in which the minor Alberto Colón was a child of six years of age when the action was brought:

"Likewise, the father is dead and has not been dead many years. The son had opportunities during the lifetime of his father to have brought this action. Courts will scan with care the evidence under such circumstances, when the person who was mostly concerned can no longer be heard. It is somewhat different when the child is young at the time of the death of the father. Not only courts are scrupulous, but the Legislature has recognized the dangers in similar instances of this kind of testimony. Section 3 of the Act of 1904 provides, among other things, that 'in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate, or ward, unless called to testify thereto by the opposite party.'"

We are not dealing with a claim against the property constituting the estate of Alberto J. Tristani, based on transactions or dealings with the deceased. An action of filiation is involved, in which no evidence with regard to the property may be adduced, inasmuch as the same would be entirely irrelevant. Once the filiation is established, the person adjudged to be a natural child shall have all the rights granted to him by law; but this in no manner changes the nature of the action nor requires any other evidence than that tending to prove the status as a natural child, which is the essential purpose sought.

We admit that the act cited by the defendant is in force, as one of the exceptions to the general rule, and hold that this exception should be applied within the limitations imposed by the same act, without extending it to cases which are not directly related to transactions or dealings of a decedent concerning his property.

In the United States there prevails in most jurisdictions the same principle which, in accordance with the Act of 1904, is in force in Puerto Rico. In the State of Delaware, for instance, section 4212 of the Revised Statutes establishes the exception as follows:

". . . . . PROVIDED THAT IN ACTIONS OR PROCEEDINGS by or against executors, administrators, or guardians, in which judgment or decree

may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction, with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party.''

It is practically the same exception established in Puerto Rico and similarly, with some variations, as to the other exceptions in force in the States that have adopted the same principle.

This exception to the general rule has been severely criticized by Wigmore and other authorities, even when applied within its proper limits. The eminent writer sets forth the reasons advanced up to the present time in favor of the exception which he characterizes as superficial, and adduces his own arguments to show that in his opinion the exception established does not rest on a solid and sound basis. Let us see what the learned writer says on pages 1004–1007 of the first volume of his work on Evidence (2d ed.):

''In almost every jurisdiction in the United States, by statutes enacted in connection with or shortly after the statute removing the general disqualification by interest, an exception was carved out of the old disqualification and was allowed to perpetuate within a limited scope the principle of the discarded rule. The scope of this modern rule excludes the testimony of the *survivor of a transaction with a decedent,* when offered against the latter's estate.

''It does not appear that there was any precedent which could have served as an example; and the almost universal vogue of this modern fragment of the old anomaly is therefore the more remarkable.

''The defenders of this rule are usually content to invoke some vague metaphor in place of a reason, but occasionally there is found an attempt at a rational justification:

''1873—BRICKELL, J., in *Louis* v. *Easton,* 50 Ala. 471: 'This right and privilege (of testifying) must be mutual. It cannot exist in the one party and not in the other. If death has closed the lips of the one party, the policy of the law is to close the lips of the other.'

"1878.—HAYMOND, J., in Owens v. Owens, 14 W. Va. 88, 95: 'The law in the exception to the privilege to testify was intended to prevent an undue advantage on the part of the living over the dead, who cannot confront the survivor, or give his version of the affair, or expose the omission, mistakes, or perhaps falsehoods of such survivor. The temptation to falsehood and concealment in such cases is considered too great to allow the surviving party to testify in his own behalf. Any other view of this subject, I think, would place in great peril the estates of the dead, and would in fact make them an easy prey for the dishonest and unscrupulous.' The argument of the latter passage, that a contrary rule 'would place in great peril the estates of the dead' sufficiently typifies the superficial reasoning on which the rule rests. Are not the estates of the living endangered daily by the present rule, which bars from proof so many honest claims? Can it be more important to save dead men's estates from false claims than to save living men's estates from loss by lack of proof?

"The truth is that the present rule is open, in almost equal degree, to every one of the objections which were successfully urged nearly a century ago against the interest-rule in general. These objections may be reduced to four heads: (1) That the supposed danger of interested persons testifying falsely exists to a limited extent only; (2) That, even so, yet, so far as they testify truly, the exclusion is an intolerable injustice; (3) That no exclusion can be so defined as to be rational, consistent and workable; (4) That in any case the test of cross-examination and the other safeguards for truth are a sufficient guaranty against frequent false decision. Every one of the first three objections applies to the present rule as amply as to the old and broader rule. The fourth applies with less apparent force, because the opponent's testimony is lacking in contradiction. And yet, upon what inconsistencies is based even this support for the rule! For its defenders in effect declare the lack of this opposing testimony to be the sole ground for an exceptional rule adapted to that particular situation; and yet, since the deceased opponent is a party, he will have been by hypothesis a potential liar equally with the disqualified survivor; so that the rule rests on the supposed lack of a questionable species of testimony equally weak with that which is excluded. There never was and never will be an exclusion on the score of interest which can be defended as either logically or practically sound. Add to this, the labyrinthine distinctions created in the application of the complicated statutes defining this rule;

and the result is a mass of vain quiddities which have not the slightest relation to the testimonial trust-worthiness of the witness:

"1895, CORLISS, J., *St. John* v. *Lofland*, 5 N. D. 140, 64 N. W. 930: 'Statutes which exclude testimony on this ground are of doubtful expediency. There are more honest claims defeated by them, by destroying the evidence to prove such claim, than there would be fictitious claims established if all such enactments were swept away and all persons rendered competent witnesses. To assume that in that event many false claims would be established by perjury is to place an extremely low estimate on human nature, and a very high estimate on human ingenuity and adroitness. He who possesses no evidence to prove his case save that which such a statute declares incompetent is remediless. But those against whom a dishonest demand is made are not left utterly unprotected because death has sealed the lips of the only person who can contradict the survivor, who supports his claim with his oath. In the legal armory, there is a weapon whose repeated thrusts he will find it difficult, and in many cases impossible, to parry if his testimony is a tissue of falsehoods, —the sword of cross-examination. For these reasons, which lie on the very surface of this question of policy, we regard it as a sound rule to be applied in the construction of statutes of the character of the one whose interpretation is here involved, that they should not be extended beyond their letter when the effect of such extension will be to add to the list of those whom the act renders incompetent as witnesses.'

"1921, *Mr. Henry W. Taft*, 'Comments on Will Contests in New York.' Yale Law Journal, xxx, 593, 605: 'This restriction not infrequently works intolerable hardship in preventing the establishment of a meritorious claim. Furthermore, it has been enforced with the most rigorous literalness, and has been the occasion of a labyrinth of subtle decisions. A long experience leads me to believe that the evils guarded against do not justify the retention of the rule. In the early development of our jurisprudence the testimony of all interested witnesses was excluded; but experience gradually led to the conclusion that the restriction should be relaxed and more reliance should be placed upon the efficacy of our process of investigating truth. Cross-examination, for instance, has been found to be well calculated to uncover a fraudulent scheme concocted by an interested party and where that has failed the scrutiny to which the testimony of a witness is subjected by the court and by the jury, has proven efficacious in discovering the truth, to say nothing of

the power of circumstantial evidence to discredit the mere oral statement of an interested witness.'

"As a matter of policy, this survival of a part of the now discarded interest-qualification is deplorable, in every respect; for it is based on a fallacious and exploted principle, it leads to as much or more false decision that it prevents, and it encumbers the profession with a profuse mass of barren quibbles over the interpretation of mere words.

"If any concession at all is to be made to the considerations of caution underlying the rule, there are three simple ways available, each of them in actual and tried operation, and each of them able to accomplish the purpose without following the crude, technical, and unjust method of disqualifying surviving witnesses. One of these, adopted in Oregon, New Mexico, and Canada, is to allow no recovery in such cases on the party's sole testimony, without corroboration of some sort. The second, followed in Connecticut, Virginia, and Oregon, is to admit, as well as the surviving party, any extant writings or declarations of the deceased party on the subject in issue. The third, invented in New Hampshire and followed in Arizona, is to exclude the testimony, except when it 'appears to the Court that injustice may be done without the testimony of the party'; this removes the arbitrary feature of the rule and gives flexibility.''

It is clearly evident that the exception established by the Act of 1904 does not apply to cases of filiation. This exception should be kept within its own limits, without enlarging its field of action. In the case at bar the testimony of the plaintiff has been corroborated by abundant evidence and there is no reason to justify its elimination; which could not be effected either, because our law of evidence does not authorize the exclusion of such testimony.

The learned counsel for the defendant maintain that the American decisions with respect to the testimony of the mother are not applicable to the Territory of Puerto Rico, in view of the fact that we have in force, since the year 1904, the Act above mentioned, which precludes a party from testifying against the heir of a deceased, unless called to testify by the opposite party. We have already said that this prohibition is not applicable to the present case. We

cited in our opinion American decisions only to show that the testimony of the mother is admissible in those States of the Union where the law of evidence is similar to ours. We mentioned the case of *Michael* v. *State,* 57 Ind. A. 520, 108 N. E. 173, to show the liberality reached on the Continent; but this does not mean that we agree that the isolated testimony of the mother with regard to the paternity of the child, would be sufficient for a decree of filiation. This is an element of proof which ought to be taken into consideration in conjunction with other acts, in order to reach that conclusion. And we wish to add here that, if we limited ourselves to the citation of the case from Indiana it was solely in order to present it as an example, since there are abundant cases holding that the testimony of the mother, without corroboration, is sufficient for a declaration of paternity; and it is maintained by the weight of authority that these proceedings, which are civil in their nature, are covered by the rules of evidence applicable to civil cases, and that the paternity of the child may be proved by a preponderance of the evidence, and that a moral certainty is unnecessary or that the same be established beyond a reasonable doubt. Such evidence is necessary when the proceeding is considered as criminal in its nature. *State* v. *Reese,* 135 Pac. 270; *State* v. *Brunnette,* 150 N. W. 271; *Commissioner of Public Charities of N. Y.* v. *Vassie,* 167 App. Div. 74; *State* v. *Law,* 144 Pac. 232; *Brantley* v. *State,* 65 So. 678; 7 C. J., page 995, sec. 128, and numerous cases cited.

Wigmore, on page 1339, section 1141, volume 2 of his work on Evidence (1st ed.) says: "At a time when parties and interested persons were disqualified, an exception was made by statute (resting probably on old traditional practice), in several of the colonial communities, and the mother permitted to be a witness in a prosecution for bastardy or suit for filiation; . . . But it was conditioned on the fact that the mother had in her travail named and accused as the father the very person now on trial as defendant." Natu-

rally, once the incapacity by reason of interest was abolished, the mother was able to testify, the competency of her testimony not depending on the requisite of these prior statements, which constituted an exception to the rule prohibiting hearsay testimony, and which very few States admit at present, by statute, based rather on the theory of allowing dying declarations. As a general rule, in the absence of a statute, the evidence is inadmissible. In Massachusetts, for example, the statements made by the mother in her travail are admissible to corroborate her testimony.

The defendant devotes several pages of its brief to a discussion of the evidence, and is of the opinion that, in accordance therewith, the judgment appealed from should have been affirmed. We deem it unnecessary to repeat the reasoning and conclusions set forth in our opinion, where this question was made the object of a careful and detailed study. We do wish to state that we quoted from the testimony of Petrona Suárez because the lower court took it into consideration in rendering its decision, in spite of the fact that, even if Josefa Colón had a child in New York, this fact in any case happened several years after Alberto Colón was engendered. We then said and now repeat that the testimony of said witness did not justify the absolute conclusion reached by the lower court. As to the testimony of the experts, the defendant maintains that we should have remanded the case to the lower court in order to give the latter an opportunity to pass upon the same. Given the nature of this evidence, we are of the opinion that we are able to weigh it without the necessity of having the lower court render a prior decision thereon. Besides, in rendering our decision, we have followed section 306 of the Code of Civil Procedure, according to which when the judgment, order, or decree of the court below is reversed, the Supreme Court shall proceed to render such judgment, order, or decree as the court below should have rendered, except when it is necessary that some matters of fact be ascertained, or the

indemnity to be fixed, or the matter to be decreed is uncertain; in any of which cases the cause shall be remanded for a new trial in the court below. From the testimony of the experts it does not appear that it is necessary that any matter of fact be ascertained, and, consequently, we acted in accordance with the law in rendering our decision, without remanding the case to the lower court.

The defendant maintains that we erred in holding that the investigation of paternity is authorized in Puerto Rico, after the amendment of 1911 to the Civil Code. We are of the opinion that we have plainly shown that the mother is not incompetent to testify as a witness, in accordance with our Law of Evidence. The amendment of 1911 to the Civil Code does not have the scope attributed to it by the defendant. According to Scaevola, the Spanish Code, taking national precedents as a basis, does not expressly prohibit the investigation of paternity, but does not authorize it either, for what it does is to authorize a judicial declaration thereof, when the same appears extra-judicially, as is inferred from subdivisions 1 and 2 of section 135. Scaevola, Commentaries to the Civil Code, vol. 3, page 181. However, the basic law in its 5th section, expressly states that the investigation of paternity shall not be allowed. There is no doubt that this was the intention of the lawmaker and so has the law been interpreted by the Spanish Courts. Then came the abolition of the incapacity to testify by reason of interest, which dissipated all doubt with regard to the right of the mother to be a witness in cases of filiation. The amendment of 1911 should be interpreted as if it had been originally adopted by our Legislature, without having to follow the 5th basis, which explains and extends the scope of section 135 of the Spanish Civil Code.

Section 189 of the Civil Code, as enacted in 1902, did not follow the Spanish Civil Code, and introduced important modifications. This section, in its subdivision 2, obliged the father to recognize his illegitimate child when publicly or

privately he has shown that it is his child, or has called it as such in conversation, or looks after its education and maintenance, and the amendment of 1911, incorporated to section 193, imposes on the father the same obligation when the child has been in the uninterrupted possession of the status of a natural child of the defendant father, justified by the conduct of the father himself or that of his family. With regard to the investigation of paternity, both enactments have the same effect. The requisites fixed in 1920 are elements of proof tending to show the possession of her status of a natural child prescribed by the law of 1911.

The learned counsel for the defendant admit that said section 189 in establishing, under subdivision 2, the tacit acknowledgment as a sufficient ground to compel the father to recognize the child, and perhaps in permitting, under subdivision 3, evidence regarding the illicit relations between the parents, authorized the investigation of paternity, inasmuch as the former enlarged the rights of an illegitimate child to the same extent as was done by the Law 11 of Toro; and, similarly as in the case of that law, the Civil Code of 1902 allowed evidence with regard to tacit or private acts of acknowledgment.

The important changes which our legislation underwent in 1902 with regard to natural children, destroyed the correlation existing between our Civil Code and the Spanish Civil Code, in so far as this very important question was concerned.

Section 193, as Scaevola very aptly states, in commenting on the corresponding section of the Spanish Civil Code, does not prohibit expressly or authorize the investigation of paternity; nor can it be interpreted in the sense that it has repealed our Law of Evidence, which provides that all persons, without exception, otherwise than is specified in sections 39 and 40, may be witnesses. This last section prescribes the cases in which a person may not be examined as a witness, and these cases do not include the investigation of paternity through the testimony of the mother.

Moreover, subdivision 3 of section 189, in 1902, similarly as subdivision 3 of section 193 in 1911, compelled the father to acknowledge his natural son when the mother was known to have lived in concubinage with the father, during her pregnancy or at the time of the birth of the child in the first case, and both during her pregnancy and at the time of the birth of the child in the second case. We hold that concubinage may not be established without showing the intimate cohabitation of the mother with the putative father. Concubinage is not established merely by showing that a man and a woman live in the same house. It is necessary to prove sexual intercourse, and if an action of filiation is involved, it must be proved that these relations existed during pregnancy and at the time of the birth of the child. Concubinage can not be confounded with marriage in so far as the evidence by which the intimacy of the relations is established. In marriage, the cohabitation is inferred from the proof of the marriage by means of the corresponding certificate; in concubinage the conclusion of its existence arises from the very facts, that is, from that intimate relation between a man and a woman. Concubinage is established by acts. Living together and sexual intercourse are not presumed. There is no document to prove them; it is necessary to present the facts, and when these are established, the inference of concubinage arises.

We have said that once the sexual relations of the putative father with the mother are established, a moral presumption arises which is as difficult to destroy as that in cases of concubinage. Of course, when we said this we referred solely to paternity as an element of evidence to establish the status of a natural child. The investigation of paternity does not have for its purpose the establishment a priori of the legal presumption, as in the case of marriage, but to facilitate to the child the means of showing his filiation, in order that a judicial decree may be rendered thereon.

The evidence should not be limited or confined to a discovery of who was the progenitor. This is only an element of proof which should be taken into consideration in conjunction with other acts, in order to establish the status of a natural child. We have not considered the relations of a man and his mistress equivalent to a concubinage. If this had been so, we would have based our judgment simply on the finding of the court below to the effect that Josefa Colón was the mistress of Alberto J. Tristani, without any need of argument. It would have sufficed to state that once the relation, which the court *a quo* considered to have been proved, was established, the status of Alberto Colón as a natural child was also established. On the contrary, we said, and we think we did so with all clearness, that this evidence, corroborated and strengthened by other acts of the father, may be sufficient to obtain and enter a decree of filiation.

In closing, we quote one of the last paragraphs of our former opinion:

"We have perhaps extended too much in examining and stating this evidence. We are of the opinion, however, that it was necessary to do so, given the nature of the case and the holdings of the court below. It is our opinion that the filiation of Alberto Colón has been satisfactorily established. The court below holds that Josefa Colón was the mistress of Alberto Tristani around the years 1922 to 1924, namely, during the time in which the child Alberto Colón was conceived. The court below holds, moreover, that Tristani visited Josefa Colón frequently at night, gave her money and paid the rent of the house in conjunction with Mr. Fortier; that Tristani paid the fees of the midwife who attended Josefa Colón during the childbirth and that he executed certain isolated acts of affection toward the minor Alberto Colón. The court below says nothing about the house purchased by Alberto Tristani for Josefa Colón. The testimony of the vendor of this house, Emilio Márquez, is unimpeached and produces the impression that it is a disinterested testimony. This witness testifies that Alberto Tristani, at the time of paying for the house told him that he had a son with Josefa Colón. The plaintiff testified also that the child was named Alberto because 'the father said that he be given that name.' These facts, added to the remaining details

and circumstances appearing in the evidence, are in our opinion sufficient to declare Alberto Colón the acknowledged natural son of Alberto Tristani.''

The motion for rehearing should be denied.

Mr. Justice Wolf and Mr. Justice Aldrey dissented.